[818 NE2d 1100, 785 NYS2d 359]

CARVEL CORPORATION, Appellant, v ELIZABETH A. NOONAN et al., Respondents, et al., Defendants, et al., Special Masters.

Argued September 8, 2004; decided October 14, 2004

## POINTS OF COUNSEL

*Gibson, Dunn & Crutcher LLP,* New York City (*Mitchell A. Karlan, Marshall King, David Arroyo, Michelle Craven* and *Michael Passante* of counsel), for appellant. I. Under applicable standards for a claim of tortious interference with prospective economic relations, the evidence of the franchisor's conduct in each of the three trials on review in these consolidated appeals did not permit a jury finding in favor of the franchisee. (*Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.,* 70 NY2d 382; *Apple Records v Capitol Records,* 137 AD2d 50; *Boscorale Operating v Nautica Apparel,* 298 AD2d 330; *Polar Intl. Brokerage Corp. v Richman,* 291 AD2d 219; *Collins v E-Magine, LLC,* 291 AD2d 350; *Sommer v Federal Signal Corp.,* 79 NY2d 540; *Purchasing Assoc. v Weitz,* 13 NY2d 267; *Camp Cr. Hospitality Inns, Inc. v Sheraton Franchise Corp.,* 139 F3d 1396; *Williams v Barkley,* 165 NY 48; *Musman v Modern Deb,* 56 AD2d 752.) II. Public harm is required for a punitive damages claim by a franchisee against its franchisor for tortious interference with the franchisee's prospective economic relations with its customers. (*Walker v Sheldon,* 10 NY2d 401; *Rocanova v Equitable Life Assur. Socy.,* 83 NY2d 603; *New York Univ. v Continental Ins. Co.,* 87 NY2d 308; *Home Ins. Co. v American Home Prods. Corp.,* 75 NY2d 196; *Prozeralik v Capital Cities Communications,* 82 NY2d 466; *Cooper Indus., Inc. v Leatherman Tool Group, Inc.,* 532 US 424; *Garrity v Lyle Stuart, Inc.,* 40 NY2d 354; *Koufakis v Carvel,* 425 F2d 892; *Honda Motor Co., Ltd. v Oberg,* 512 US 415; *BMW of N. Am., Inc. v Gore,* 517 US 559.)

*Duane Morris LLP,* Philadelphia, Pennsylvania (*J. Manly Parks, Wayne A. Mack* and *James H. Steigerwald* of counsel), and *Aegis J. Frumento,* New York City, for respondents. I. Under applicable standards for a claim of tortious interference with prospective economic relations, the evidence of the franchisor's conduct in each of the three trials on review in these consolidated appeals permitted a jury finding in favor of the franchisee. (*Federal Waste Paper Corp. v Garment Ctr. Capitol,* 268 App Div 230, 294 NY 714; *Guard-Life Corp. v S. Parker Hardware Mfg. Corp.,* 50 NY2d 183; *Jews for Jesus Inc. v Jewish Community Relations Council of N.Y., Inc.,* 968 F2d 286; *Bogoni v Friedlander,* 197 AD2d 281; *Alexander & Alexander v Fritzen,* 68 NY2d 968; *NBT Bancorp v Fleet/Norstar Fin. Group,* 87 NY2d 614; *Pagliaccio v Holborn Corp.,* 289 AD2d 85; *Harden, S.P.A. v Commodore Elecs.,* 90 AD2d 733; *Coleman & Morris v Pisciotta,* 279 App Div 656; *A.S. Rampell, Inc. v Hyster Co.,* 3 NY2d 369.) II. Public harm is not required for a punitive damages claim by a franchisee against its franchisor for tortious interference with the franchisee's prospective economic relations with its customers. (*H & R Indus., Inc. v Kirshner,* 899 F Supp 995; *New York Univ. v Continental Ins. Co.,* 87 NY2d 308; *Rocanova v Equitable Life Assur. Socy.,* 83 NY2d 603; *Blank v Baronowski,* 959 F Supp 172; *Sauer v Xerox Corp.,* 95 F Supp 2d 125; *Queenie, Ltd. v Nygard Intl.,* 204 F Supp 2d 601, 321 F3d 282; *Buchwald & Assoc. v Rich,* 281 AD2d 329; *Walker v Sheldon,* 10 NY2d 401; *Giblin v Murphy,* 73 NY2d 769; *Rochelle Assoc. v Fleet Bank of N.Y.,* 230 AD2d 605.)

*Boies, Schiller & Flexner LLP,* Albany (*George F. Carpinello* of counsel), for Caesars Entertainment, Inc., amicus curiae. I. New York law, in its current state, does not provide sufficient guidance as to the bounds of legitimate competition. (*Guard-Life Corp. v S. Parker Hardware Mfg. Corp.,* 50 NY2d 183; *A.S. Rampell, Inc. v Hyster Co.,* 3 NY2d 369; *Duane Jones Co. v Burke,* 306 NY 172; *Rice v Manley,* 66 NY 82; *Livoti v Elston,* 52 AD2d 444; *Gold Medal Farms v Rutland County Coop. Creamery,* 9 AD2d 473; *Lurie v New Amsterdam Cas. Co.,* 270 NY 379; *NBT Bancorp v Fleet/Norstar Fin. Group,* 87 NY2d 614.) II. "Wrongful means" should be defined as illegal or independently tortious conduct. (*National Data Payment Sys., Inc. v Meridian Bank,* 212 F3d 849; *Speakers of Sport, Inc. v ProServ, Inc.,* 178 F3d 862; *DP-Tek, Inc. v AT & T Global Info. Solutions Co.,* 100 F3d 828; *Amerinet, Inc. v Xerox Corp.,* 972 F2d 1483; *Great Escape, Inc. v Union City Body Co., Inc.,* 791 F2d 532; *Conoco Inc. v Inman Oil Co., Inc.,* 774 F2d 895; *MLI Indus. v New York*

*State Urban Dev. Corp.,* 205 AD2d 998; *Union Car Adv. Co. v Collier,* 263 NY 386.) III. The "wrongful means" test should apply even where defendant is not technically a "competitor" of plaintiff. IV. Tortious interference should be actionable only when directed at the third party in plaintiff's business relationship. (*G.K.A. Beverage Corp. v Honickman,* 55 F3d 762; *Piccoli A/S v Calvin Klein Jeanswear Co.,* 19 F Supp 2d 157; *Marilyn Miglin, Inc. v Gottex Indus., Inc.,* 790 F Supp 1245; *Feeley v Whitman Corp.,* 65 F Supp 2d 164; *Volvo N. Am. Corp. v Men's Intl. Professional Tennis Council,* 857 F2d 55.) V. Motive should not be relevant on a claim for tortious interference with prospective economic relations where defendant's actions are intended to advance its own economic interests. (*Beardsley v Kilmer,* 236 NY 80; *Biber Bros. News Co. v New York Evening Post,* 144 Misc 405; *Forken v CIGNA Corp.,* 234 AD2d 992; *Quail Ridge Assoc. v Chemical Bank,* 162 AD2d 917; *Terry v Dairymen's League Coop. Assn.,* 2 AD2d 494; *Reinforce, Inc. v Birney,* 308 NY 164; *Burns Jackson Miller Summit & Spitzer v Lindner,* 59 NY2d 314; *Squire Records v Vanguard Rec. Socy.,* 25 AD2d 190, 19 NY2d 797; *Impastato v Hellman Enters.,* 147 AD2d 788.) VI. "Economic pressure" should not be a basis for finding of wrongful means, unless such economic pressure violates antitrust laws or other well-established tort principles. (*NBT Bancorp. v Fleet/Norstar Fin. Group,* 87 NY2d 614; *Guard-Life Corp. v S. Parker Hardware Mfg. Corp.,* 50 NY2d 183; *New York Univ. v Continental Ins. Co.,* 87 NY2d 308; *Rocanova v Equitable Life Assur. Socy.,* 83 NY2d 603; *Catskill Dev., L.L.C. v Park Place Entertainment Corp.,* 217 F Supp 2d 423.) VII. Applying the proposed standard to the *Carvel* actions should result in dismissal.

*Proskauer Rose LLP,* New York City (*Dale A. Schreiber* and *Nancy Kilson* of counsel), for Independent Franchisees of Weight Watchers International, Inc., amicus curiae. I. Franchisees, like other contracting parties in New York, should be able to assert tort claims in appropriate cases. (*Apple Records v Capital Records,* 137 AD2d 50; *A.S. Rampell, Inc. v Hyster Co.,* 3 NY2d 369; *Collins v E-Magine, LLC,* 291 AD2d 350; *Boscorale Operating v Nautica Apparel,* 298 AD2d 330; *North Shore Bottling Co. v Schmidt & Sons,* 22 NY2d 171; *New York Univ. v Continental Ins. Co.,* 87 NY2d 308; *Rich v New York Cent. & Hudson Riv. R.R. Co.,* 87 NY 382; *Albemarle Theatre v Bayberry Realty Corp.,* 27 AD2d 172; *Sommer v Federal Signal Corp.,* 79 NY2d 540.) II. Franchisors should not be free from liability for *any* conduct motivated by economic self-interest, nor should the "wrongful

means" standard apply to franchisors. (*Guard-Life Corp. v S. Parker Hardware Mfg. Corp.*, 50 NY2d 183; *NBT Bancorp v Fleet/Norstar Fin. Group*, 87 NY2d 614; *Mobil Oil Corp. v Rubenfeld*, 48 AD2d 428, 40 NY2d 936.)

*Law Offices of Michael B. Wolk, P.C.*, New York City (*Michael B. Wolk, Edmund F. Wolk, Peter J. Rossi* and *Michael E. Morrison* of counsel), for Inverraz Group, amicus curiae. I. This Court has indicated that the Restatements (Second) of Torts' doctrinal approach is consistent with New York law in the tortious interference realm. (*Guard-Life Corp. v S. Parker Hardware Mfg. Corp.*, 50 NY2d 183.) II. The historical development, and common-law evolution, of a claim for tortious interference with prospective business relations indicates that this Court should reject most, if not all, of the "policy arguments" advanced in Carvel Corporation's brief and in appellant's amicus brief. (*Devlin v United States*, 352 F3d 525; *Guard-Life Corp. v S. Parker Hardware Mfg. Corp.*, 50 NY2d 183; *Browning v Clinton*, 292 F3d 235; *Rich v New York Cent. & Hudson Riv. R.R. Co.*, 87 NY 382; *North Shore Bottling Co. v Schmidt & Sons*, 22 NY2d 171; *Albemarle Theatre v Bayberry Realty Corp.*, 27 AD2d 172; *S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp.*, 108 AD2d 351; *Credit Agricole Indosuez v Rossiyskiy Kredit Bank*, 94 NY2d 541.) III. Under New York law, an adjudication of a claim for tortious interference with prospective business relations involves the application of a three-part, shifting burden of proof that imposes different pleading and proof obligations on the parties at different stages of the case. (*Guard-Life Corp. v S. Parker Hardware Mfg. Corp.*, 50 NY2d 183; *NBT Bancorp. v Fleet/Norstar Fin. Group*, 87 NY2d 614; *A.S. Rampell, Inc. v Hyster Co.*, 3 NY2d 369; *Alexander & Alexander v Fritzen*, 68 NY2d 968; *Scutti Enters., LLC v Park Place Entertainment Corp.*, 322 F3d 211; *S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp.*, 108 AD2d 351; *Albemarle Theatre v Bayberry Realty Corp.*, 27 AD2d 172; *Felsen v Sole Cafe Mfg. Corp.*, 24 NY2d 682; *Bogoni v Friedlander*, 197 AD2d 281; *Unionport Shoes v Parkchester S. Condominium*, 205 AD2d 385.) IV. There is no compelling policy reason for vacating a jury's award of punitive damages against a defendant, such as Carvel Corporation, whom a jury has found independently liable, in tort, for willfully violating an independent societally-imposed duty because of the happenstance that, under the circumstances, defendant's intentionally tortious conduct also violated a privately-imposed contractual duty between the parties. (*Giblin v Murphy*, 73 NY2d 769; *Rocanova v Equitable Life Assur. Socy.*, 83 NY2d

603; *Buchwald & Assoc. v Rich,* 281 AD2d 329; *Queenie, Ltd. v Nygard Intl.,* 321 F3d 282; *Rich v New York Cent. & Hudson Riv. R.R. Co.,* 87 NY 382; *North Shore Bottling Co. v Schmidt & Sons,* 22 NY2d 171; *Albemarle Theatre v Bayberry Realty Corp.,* 27 AD2d 172; *S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp.,* 108 AD2d 351; *Guard-Life Corp. v S. Parker Hardware Mfg. Corp.,* 50 NY2d 183; *New York Univ. v Continental Ins. Co.,* 87 NY2d 308.)

## OPINION OF THE COURT

R.S. SMITH, J.

Several franchisees of Carvel Corporation sued it in federal court, complaining of the distribution of Carvel's products through supermarkets that competed with the franchisees. Juries awarded damages to three of the franchisees on tort and contract claims, and Carvel appealed to the United States Court of Appeals for the Second Circuit. That court has certified to us the question of whether the franchisees have a valid tort claim for "interference with prospective economic relations." We hold that they do not.

### The Facts

Until the early 1990's, Carvel ice cream was distributed only through franchised stores, and Carvel had repeatedly told its franchisees it had no plans to sell through supermarkets. A decline in Carvel's fortunes caused it to change its mind, however, and Carvel adopted a "supermarket program." The program called for sales to supermarkets by Carvel itself and by those franchisees that chose to participate in the program— which required franchisees to pay substantial license fees and to upgrade their stores. Most franchisees chose not to participate. From 1993 to 2000, the supermarket program grew rapidly, while many franchised stores went out of business.

The franchisees assert that Carvel's supermarket program was harmful to them in itself, and that the details of the program's implementation made things worse. Among their grievances are that Carvel sold to supermarkets at bargain prices; that it issued coupons to customers that Carvel would redeem from supermarkets but not from franchisees; and that those coupons were printed on bags that Carvel required franchisees to use in their stores. They contend that, as their expert witness testified, Carvel's supermarket program was not "consistent with the customary practices and standards in the franchise industry."

The franchisees' claims, both in contract and tort, are illuminated by their written agreements with Carvel. Those agreements were of two types. The earlier agreements, known as "Type A," included a specific restriction on Carvel's rights to compete with its franchisees, providing that Carvel "will not establish or license another person to establish a Carvel Store" within a quarter mile of the franchisee's store on the same street. The Type A agreements contained other language, including a reference to "a unique system for the production, distribution and merchandising of Carvel products," that the franchisees interpret as prohibiting Carvel from implementing its supermarket program.

The later, "Type B," agreements also contained the "unique system" language, but not the quarter-mile restriction. They provided that the license granted to the franchisee was "non-exclusive," and that Carvel "in its sole and absolute discretion" could license other Carvel stores and could sell its products "through the same or different delivery systems or other distribution channels." The franchisees who signed Type B agreements had all received, before they signed the agreements, an offering circular saying that Carvel was free to sell through "supermarkets."

Of the three franchisees whose cases are now before us, two, Marsella and the Noonans, signed Type A agreements; the third, Giampapa, signed Type B. Each agreement contains a New York choice of law clause, and it is not disputed that New York law governs both the contract and tort claims.

The two franchisees who signed Type A agreements were allowed to go to juries on claims that Carvel "breached its franchise agreement" with them. One of them, the Noonans, got a favorable verdict on that claim. All three of the franchisees went to juries on claims that Carvel "breached the implied covenant of good faith and fair dealing" and "tortiously interfered with the [franchisee's] existing or prospective business relations," and all three got favorable verdicts on those two claims. Only the verdicts for tortious interference with business relations are now our concern.

### The Certified Questions

The Second Circuit Court of Appeals certified the following two questions to us:

1. "Under applicable standards for a claim of tor-

tious interference with prospective economic relations, did the evidence of the franchisor's conduct in each of the three trials on review in these consolidated appeals permit a jury finding in favor of the franchisee?" (350 F3d 6, 23 [2003].)

2. "Is public harm required for a punitive damages claim by a franchisee against its franchisor for tortious interference with the franchisee's prospective economic relations with its customers?" (*Id.* at 26.)

We answer the first question "no." This answer renders the second question academic.

## Discussion

The franchisees' tort claim is that Carvel unlawfully interfered with the relationships between the franchisees and their customers. The franchisees do not claim that the customers had binding contracts that Carvel induced them to breach; they allege only that, by implementing its supermarket program, Carvel induced the customers not to buy Carvel products from the franchisees. The juries have found that Carvel did so induce customers, and the question for us is whether that inducement was tortious interference under New York law. We conclude that it was not because Carvel's conduct, which did not constitute a crime or an independent tort and was not aimed solely at harming franchisees, was also not the sort of egregious wrongdoing that might support a tortious interference claim in the absence of such an independently unlawful act or evil motive.

We have recognized that inducing breach of a binding agreement and interfering with a nonbinding "economic relation" can both be torts, but that the elements of the two torts are not the same. Our leading cases, as the Second Circuit Court of Appeals noted, are *Guard-Life Corp. v S. Parker Hardware Mfg. Corp.* (50 NY2d 183 [1980]) and *NBT Bancorp Inc. v Fleet/Norstar Fin. Group, Inc.* (87 NY2d 614 [1996]). We said in *NBT*, summarizing what we had held in *Guard-Life*:

> "[T]he degree of protection available to a plaintiff for a competitor's tortious interference with contract is defined by the nature of the plaintiff's enforceable legal rights. Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interfer-

ence with contractual relations even if the defendant was engaged in lawful behavior. Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant." (87 NY2d at 621 [citations omitted].)

By saying in *NBT* that a defendant who induced the breach of a binding contract could be liable "even if the defendant was engaged in lawful behavior," we implied that the same was not ordinarily true where the plaintiff complained only of "interference with prospective contract rights." This applies equally if not a fortiori, here, where the franchisees complain of interference not with "contract rights" but only with existing or prospective economic relations.

Under *NBT*, where a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not "lawful" but "more culpable." The implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be "lawful" and thus insufficiently "culpable" to create liability for interference with prospective contracts or other nonbinding economic relations.

Since the franchisees have not shown that Carvel's conduct was criminal or independently tortious, they cannot recover unless an exception to the general rule is applicable. Such an exception has been recognized where a defendant engages in conduct "for the sole purpose of inflicting intentional harm on plaintiffs" (*NBT Bancorp, Inc. v Fleet/Norstar Fin. Group, Inc.*, 215 AD2d 990, 990 [3d Dept 1995], *affd* 87 NY2d 614 [1996]), but that exception clearly does not apply here. It is undisputed that Carvel's motive in interfering with the franchisees' relationships with their customers was normal economic self-interest; Carvel wanted to reverse a period of business declines and make itself more profitable. It was not acting solely to hurt the franchisees; indeed, one of the franchisees' prize pieces of evidence is a statement by a Carvel executive, in colorful terms, that he was completely indifferent to the franchisees' fate.

We did not decide in *Guard-Life* or *NBT*, and we do not decide today, whether any other exception to the general rule exists—whether there can ever be other instances of conduct which, though not a crime or tort in itself, was so "culpable," to use *NBT*'s word, that it could be the basis for a claim of tortious

interference with economic relations. That is a question we leave for another day, because no such egregious conduct was shown here.

The sort of "more culpable" conduct we had in mind in *NBT* was described in *Guard-Life*, where we referred to a Restatement section dealing with the issue of when a business competitor may recover against another for "tortious interference." Where no binding contract is interfered with, and there is no "unlawful restraint of trade," the Restatement provides that the competitor will not be liable so long as "the means employed are not wrongful." (*Guard-Life*, 50 NY2d at 191, summarizing Restatement [Second] of Torts § 768.) Continuing to draw on the Restatement, we added in *Guard-Life*:

> " 'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract ([Restatement (Second) of Torts] § 768, Comment *e*; § 767, Comment *c*)." (*Id.*)

The Restatement section on which *Guard-Life* relied refers to actions between business competitors, and the plaintiff and defendant in *Guard-Life* were competitors in a marketplace. The logic of *Guard-Life* and *NBT* does not, however, depend on the parties' status as competitors. The existence of competition may often be relevant, since it provides an obvious motive for defendant's interference other than a desire to injure the plaintiff; competition, by definition, interferes with someone else's economic relations. Where the parties are not competitors, there may be a stronger case that the defendant's interference with the plaintiff's relationships was motivated by spite. But as long as the defendant is motivated by legitimate economic self-interest, it should not matter if the parties are or are not competitors in the same marketplace. Indeed, in *NBT*, while we referred to the defendant as the plaintiff's "competitor" (87 NY2d at 617), it is not clear from the opinion whether we meant that they were competitors in their everyday business, or only that they were competing for the particular corporate acquisition that gave rise to the lawsuit.

Thus it is not relevant here whether we characterize Carvel and its franchisees as "competitors." The question, under *Guard-Life* and *NBT*, is whether the "means" employed by

Carvel were "wrongful" or "culpable" as we used those terms in those cases. Most of the items in *Guard-Life*'s catalog of "wrongful means" are acts that would be criminal or independently tortious, and most are obviously absent here: Carvel did not drive the franchisees' customers away by physical violence, or lure them by fraud or misrepresentation, or harass them with meritless litigation (*Guard-Life*, 50 NY2d at 191).

The franchisees claim that Carvel did use wrongful "economic pressure" (*id.*), but that argument is ill-founded for two independent reasons.

First, it is ill-founded because the economic pressure that must be shown is not, as the franchisees assume, pressure on the franchisees, but on the franchisees' customers. As federal courts applying New York law have recognized, conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship. (*G.K.A. Beverage Corp. v Honickman*, 55 F3d 762, 768 [2d Cir 1995] [claim dismissed because alleged conduct was not directed at plaintiff's customers]; *Fonar Corp. v Magnetic Resonance Plus, Inc.*, 957 F Supp 477, 482 [SD NY 1997] ["(U)nder New York law, in order for a party to make out a claim for tortious interference with prospective economic advantage, the defendant must . . . direct some activities towards the third party . . ."]; *Piccoli A/S v Calvin Klein Jeanswear Co.*, 19 F Supp 2d 157, 167-168 [SD NY 1998] [claim must fail because "defendants' alleged conduct concededly was not directed towards any third party with whom Piccoli had an existing or prospective business relationship"].) While economic pressure brought to bear by one contracting party on the other may, on rare occasions, be tortious (*see Albemarle Theatre, Inc. v Bayberry Realty Corp.*, 27 AD2d 172 [1st Dept 1967]; *Rich v New York Cent. & Hudson Riv. R.R. Co.*, 87 NY 382 [1882]), it cannot constitute the tort of interference with economic relations. Here, all Carvel did to the franchisees' customers was to make Carvel goods available in supermarkets at attractive prices; this, in the language of *Guard-Life*, was not "pressure" on these third parties but legitimate "persuasion," and thus tortious interference with economic relations was not established.

The franchisees' argument is also ill-founded because the Carvel activities they complain of do not amount to the sort of extreme and unfair "economic pressure" that might be "wrong-

ful'' under *Guard-Life* and *NBT*. The crux of the franchisees' complaint is that Carvel distributed its products through competitive channels, to an extent and in a way that was inconsistent with the franchisor-franchisee relationship. But the relationship between franchisors and franchisees is a complex one; while cooperative, it does not preclude all competition; and the extent to which competition is allowed should be determined by the contracts between the parties, not by courts or juries seeking after the fact to devise a code of conduct.

The facts of this case illustrate the point. Both the Type A and Type B contracts between Carvel and its franchisees expressly dealt with the question of when competition would be forbidden and when permitted. To the extent that the express words of the contracts failed to prohibit some acts arguably inconsistent with the nature of the relationship, the franchisees could—and did—invoke the implied covenant of good faith and fair dealing. The intervention of tort law to regulate when a franchisor may or may not compete with its franchisees is neither necessary nor useful.

Apart from attacking the supermarket program in general as excessively and destructively competitive, the franchisees also attack the coupon-redemption element of that program as excessive ''economic pressure.'' The essence of the coupon program was to give customers who used coupons a better price when they shopped in supermarkets. This, like any other form of price competition, should be regulated, if at all, by the franchisor-franchisee contract, not by tort law. The mere institution of a coupon program was not ''economic pressure'' rising to the level of ''wrongful'' or ''culpable'' conduct in the *Guard-Life/NBT* sense.

The franchisees also claim that, by putting coupons on the bags used by the franchisees—and thus compelling them, in effect, to promote products sold in supermarkets in competition with their own—Carvel went beyond legitimate competitive activity. The evidence of this practice, however, is extremely thin. No such evidence was introduced by either Marsella or Giampapa. John Noonan testified that the Noonans ''had to'' give their customers bags supplied by Carvel, and that an exhibit counsel showed him, a copy of a bag containing a coupon, looked like ''the kind of Carvel bags . . . used in [the Noonans'] Carvel store from time to time.'' There was no evidence that the Noonans or any other franchisees complained of having to distribute these bags, or were threatened by Carvel with consequences if

they did not do so. There is no evidence of how many bags containing coupons were distributed, or what if any economic impact the coupons derived from bags had on any franchisee. At best for the franchisees, the record shows that the Noonans received some indeterminate number of coupon-bearing bags from Carvel "from time to time" and gave them to customers. This does not come close to showing the kind of "economic pressure" that might support a claim for tortious interference with economic relations—quite apart from the fact that, as explained above, that tort could exist only if the "pressure" were on the customers, not the franchisees.

The franchisees argue that their tort claim is supported by our decision in *A.S. Rampell, Inc. v Hyster Co.* (3 NY2d 369 [1957]), but *Rampell* is distinguishable. The defendant in *Rampell*, a manufacturer, had enticed away not its distributor's customers, but the distributor's key employees. The distributor claimed that, because of the "relation of confidence" between it and the manufacturer, the inducement was actionable "since its real purpose was the appropriation by [the manufacturer] of plaintiff's sales organization and good will" (3 NY2d at 375). No similar claim is made here, and our decision upholding the complaint in *Rampell* does not alter our conclusion in this case.

Accordingly, the first certified question should be answered in the negative and the second not answered as academic.

GRAFFEO, J. (concurring). We concur that the first certified question should be answered in the negative because, under the particular facts and circumstances of this case, Carvel's conduct was not sufficiently improper to support a claim for tortious interference with prospective contractual relations. We write separately, however, because we find that the standard applied by the majority is too restrictive. We would adopt the rule set forth in Restatement (Second) of Torts § 766B, which provides that improper conduct is the appropriate standard in a tortious interference with prospective contractual relations case involving noncompetitors.

The Restatement (Second) of Torts distinguishes between interference by a noncompetitor and interference by a market competitor. Section 766B, applicable to noncompetitors, provides that a defendant "who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation." In contrast, section 768 (1)

states that a "competitor" who interferes with another's prospective contractual relation—where "the relation concerns a matter involved in the competition between the [parties]"—will be liable for such interference only where the interferer employed wrongful means. Thus, the relevant inquiry under the Restatement in determining the applicable standard is whether the interfering party is a market competitor of the plaintiff.

We have previously applied Restatement § 768's wrongful conduct test in cases involving competitors. In *Guard-Life Corp. v S. Parker Hardware Mfg. Corp.* (50 NY2d 183 [1980]), we held that where the injured party and interfering party are "business competitors," the injured party must establish that the interfering party employed wrongful means to state a claim for tortious interference with prospective contractual relations (*id.* at 190-191, citing Restatement [Second] of Torts § 768). In *NBT Bancorp Inc. v Fleet/Norstar Fin. Group, Inc.* (87 NY2d 614 [1996]), we relied on *Guard-Life* in affirming the dismissal of a tortious interference claim by a financial institution against a competing bank, holding that the plaintiff produced insufficient evidence that the defendant employed wrongful means.[1]

Here, Carvel was not a "competitor" of its franchisees within the meaning of the Restatement. Rather, for the purposes of this claim, Carvel and its franchisees were more akin to economic partners, whose relationship contemplated cooperation, mutual promotion of Carvel products and a joint interest in maintaining consumer loyalty. Clearly, the expectations of these parties, particularly the franchisees, differed from that of commercial competitors with no product commonality. Moreover, to the extent that Carvel was technically "competing" with its franchisees for customers, such competition was not true free market competition, since Carvel was in a position of dominance by virtue of its franchisor-franchisee relationship. In this context, we therefore would apply section 766B of the Restatement rather than employ the section 768 wrongful means standard.

The majority concludes otherwise, holding that where a defendant acts in its own economic self-interest, the standard applicable to a tortious interference claim is whether the defen-

---

1. We have defined wrongful means "as representing 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract'" (*NBT*, 87 NY2d at 624, quoting *Guard-Life*, 50 NY2d at 191).

dant employed "wrongful means" or committed "egregious wrongdoing." The majority thus posits that "it is not relevant here whether we characterize Carvel and its franchisees as 'competitors.'" (Majority op at 191.) The relevant inquiry under the Restatement, however, is directed to the nature of the parties' relationship as competitors or noncompetitors. This issue regarding the interfering party's economic self-interest is not determinative; rather, where the parties are noncompetitors, economic self-interest under the Restatement is but one of the factors—albeit a significant one—to consider in determining whether the interferer acted improperly.[2]

Section 767 of the Restatement (Second) of Contracts enumerates a variety of factors to consider when evaluating a claim of improper interference:

> "(a) the nature of the actor's conduct,
>
> "(b) the actor's motive,
>
> "(c) the interests of the other with which the actor's conduct interferes,
>
> "(d) the interests sought to be advanced by the actor,
>
> "(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> "(f) the proximity or remoteness of the actor's conduct to the interference and
>
> "(g) the relations between the parties."

Additionally, commentary to the Restatement categorizes economic pressure as one type of interference that may constitute improper conduct and specifies the factors to analyze:

> "The question whether [economic] pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the gen-

---

2. Of course, we agree with the majority that conduct rising to the level of an independent tort or a crime, or conduct aimed solely at harming a plaintiff, would also support a tortious interference claim.

eral reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective" (Restatement [Second] of Torts § 767, Comment *c*).[3]

Although we conclude that the improper conduct standard should apply, we nonetheless concur with the majority holding because, based on the record in this case, the proof of economic pressure engaged in by Carvel does not rise to the level of improper conduct. Reviewing all of the factors listed in section 767, the franchisees' proof fails to establish that Carvel acted improperly with respect to either the Type A or Type B franchisees. As an initial matter, because the determination of whether economic pressure is improper must be reviewed "in the light of the circumstances in which it is exerted" and section 767 specifies that "the relations between the parties" is a consideration, Carvel's actions must be analyzed in the context of its contractual agreements with its franchisees.

Type B franchisees, like Giampapa, expressly agreed that Carvel could sell its products "through the same or different delivery systems or other distribution channels," and a disclosure form clarified that such alternative marketing channels could include "supermarkets." Because the Type B agreements expressly permitted Carvel's sale of ice cream cakes to supermarkets, and the franchisees under such contracts had full knowledge that Carvel products could be sold in retail venues other than Carvel stores, such sales do not constitute

---

**3.** In discussing "economic pressure" as wrongful means, the majority limits that theory solely to situations where the defendant directs such pressure at parties with whom the plaintiff seeks a contractual relationship. The majority relies on a number of federal cases in support of this proposition (*see G.K.A. Beverage Corp. v Honickman*, 55 F3d 762, 768 [2d Cir 1995] [tortious interference claim dismissed because plaintiffs made "no allegations that (the defendants) had any contact with the (plaintiffs') customers or that (the defendants) tried to convince the customers to make contracts with them rather than the (plaintiffs)"], *cert denied* 516 US 944 [1995]; *Piccoli A/S v Calvin Klein Jeanswear Co.*, 19 F Supp 2d 157, 167-168 [SD NY 1998] [tortious interference claim dismissed where "the defendants' alleged conduct concededly was not directed towards any third party with whom (the plaintiff) had an existing or prospective business relationship"]; *Fonar Corp. v Magnetic Resonance Plus, Inc.*, 957 F Supp 477, 482 [SD NY 1997] [quoting *Honickman*], *cert denied sub nom. Domenick v Fonar Corp.*, 522 US 908 [1997]). These cases suggest that the allegedly interfering party must have some direct contact with the third-party customers, thereby inducing them not to deal with the plaintiffs. In this case, Carvel did have contact with the franchisees' customers through the supermarket program. But these cases do not hold that "economic pressure" must be exerted on third parties.

economic pressure rising to the level of improper conduct sufficient to support a tortious interference claim by the Type B franchisees.

A closer case is presented with respect to the Type A franchisees. The Type A franchise agreements restrict Carvel from licensing other Carvel stores within a quarter of a mile of a franchisee, creating a relatively small sales territory for the franchisee. The agreements also refer to "a unique system for the production, distribution and merchandising of Carvel products." The franchisees assert that Carvel's supermarket program is inconsistent with the unique system of Carvel stores envisioned in their agreements and amounted to improper economic pressure. Because Carvel and its franchisees were not operating in an arm's length environment, "the relations between the parties" factor weighs in the franchisees' favor.

Balancing each of the factors, however, compels the conclusion that Carvel did not act improperly. Carvel's conduct in selling ice cream cakes to supermarkets, in and of itself, is not coercive in nature and is not compelling evidence of improper economic pressure. Moreover, Carvel's supermarket sales were not specifically aimed at inducing particular customers away from the franchisees; such sales were aimed at supermarket customers in general. Additionally, we agree with the majority that the franchisees' evidence regarding Carvel's practice of requiring them to use bags with printed coupons redeemable only at supermarkets is vague and insubstantial.

In accordance with section 767, the supermarket program must also be considered in light of Carvel's motive, as well as the interests Carvel sought to advance through its implementation. As a result of declining sales due to growing competition in the frozen desserts industry, Carvel commissioned a study on its market decline. The study concluded that the creation of a supermarket program "is totally necessary if Carvel is to survive as a brand over the next decade." Thus, in creating the supermarket program, which Carvel introduced in response to this study, Carvel was legitimately concerned with its future profitability and cannot be said to have been primarily motivated by a desire to interfere with relations between the franchisees and their customers.

Concluding that the franchisees' claim does not meet the improper conduct standard, we therefore agree that the first certified question should be answered in the negative.

Judges G.B. SMITH, ROSENBLATT and READ concur with Judge R.S. SMITH; Judge GRAFFEO concurs in result in a separate opinion in which Judge CIPARICK concurs; Chief Judge KAYE taking no part.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.17 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question No. 1 answered in the negative and certified question No. 2 not answered upon the ground that it has been rendered academic.