■ Steve Pappas et al., Appellants, v Steve Tzolis, Respondent, et al., Defendant. [932 NYS2d 439]—

Plaintiffs and defendant Steve Tzolis formed defendant Vrahos LLC for the specific purpose of entering into a long-term lease on a building in Manhattan. Vrahos was created as a Delaware limited liability company, although the operating agreement expressly provided that the agreement was governed by New York law. The lease, which commenced in January 2006, required the payment of a security deposit of $1,192,500 and personal guarantees from Tzolis and plaintiff Steve Pappas. The operating agreement specified that Tzolis would advance the security deposit. It further provided that, as consideration for his furnishing of the security deposit, Tzolis would have the right to enter into a sublease of the property with Vrahos. This was conditioned on his paying additional monies to Vrahos above the rental payments that Vrahos was required to pay directly to the landlord.

As concerns this appeal, the operating agreement also contained the following relevant provision: "Any Member may

engage in business ventures and investments of any nature whatsoever, whether or not in competition with the LLC, without obligation of any kind to the LLC or to the other Members.''

Tzolis exercised his right to sublease the building. However, he failed to make the additional payments to Vrahos that were required by the operating agreement. In September 2006, a few months after the subtenancy began, Tzolis suggested to plaintiffs that they assign their interests in Vrahos to him. He claimed that he did not want to make the additional rent payments and would rather take over the prime lease. Plaintiffs agreed, and negotiated buyouts of $1,000,000 for Pappas and $500,000 for plaintiff Constantine Ifantopoulos. The assignment agreements between plaintiffs and Tzolis provided that the assignment would become effective on the later of the date on which the landlord released Pappas from his personal guarantee and the date on which Pappas received the assignment fee. If either of those events had not taken place by February 5, 2007, the assignment would be rendered null and void. At the same time as they executed their assignment agreement, plaintiffs and Tzolis signed a handwritten ''certificate,'' which provided, in pertinent part, that ''each of the undersigned Sellers, in connection with their respective assignments to Steve Tzolis of their membership interests in Vrahos LLC, has performed their own due diligence in connection with such assignments. Each of the undersigned Sellers has engaged its own legal counsel, and is not relying on any representation by Steve Tzolis or any of his agents or representatives, except as set forth in the assignments & other documents delivered to the undersigned Sellers today. Further, each of the undersigned Sellers agrees that Steve Tzolis has no fiduciary duty to the undersigned Sellers in connection with such assignments.''

The assignments to Tzolis became effective shortly after February 20, 2007, the date on which Pappas was released from his personal guarantee. Six months later, Vrahos, now wholly owned by Tzolis, assigned its lease to nonparty Charlton Soho LLC for $17.5 million. Pappas claims that he later discovered that, unbeknownst to plaintiffs at the time, Tzolis had begun negotiating the assignment of the lease to nonparty Extell Development Company, Charlton's owner, months before plaintiffs assigned their interests in Vrahos to Tzolis.

The complaint asserts nine causes of action against Tzolis. The first is that, in failing to disclose to them that he and Extell were negotiating a lucrative sale of Vrahos's leasehold interest, and then engineering the buyout of their interests, Tzolis

breached a fiduciary duty that he owed to plaintiffs. The second claim is for misappropriation of a business opportunity of Vrahos. The third is for breach of contract and of the implied covenant of good faith and fair dealing, although it does not identify the contract that Tzolis is alleged to have breached. The fourth cause of action is for conversion, the fifth for unjust enrichment, and the sixth for rescission and a declaratory judgment that not only was plaintiffs' assignment of their interests in Vrahos to Tzolis rendered null and void by Trolis's actions, but that, in addition, Tzolis forfeited his own interest in the entity. Plaintiffs' seventh and eighth causes of action seek, respectively, an equitable accounting and the imposition of a constructive trust. The ninth cause of action asserts that Tzolis tortiously caused Vrahos to interfere with plaintiffs' interests. The tenth cause of action sounds in fraud and misrepresentation and is based on Tzolis's failure to advise plaintiffs, before Tzolis purchased their interests in Vrahos, of the ongoing negotiations with Extell. Finally, the eleventh cause of action was brought derivatively on behalf of Vrahos and asserts that Tzolis breached his fiduciary duty to the entity.

Tzolis moved to dismiss the complaint in its entirety, pursuant to CPLR 3211 (a) (1) and (7). He argued that he and plaintiffs never intended to enter into a fiduciary relationship and that he thus had no duty to disclose his negotiations with Extell. He further asserted that Delaware law governed Vrahos's internal affairs, and that it permitted the elimination of fiduciary duties among members, which he contended was achieved by paragraph 11 of the operating agreement. Based on this theory, Tzolis argued that all of his dealings with Extell were immune from claims for breach of fiduciary duty. He further argued that because plaintiffs executed the certificate and willingly entered into the assignment agreement, none of the causes of action stated a claim against him. Plaintiffs countered that paragraph 11 could not be construed in such a way as to permit Tzolis's actions, and that their assignment of their interests in Vrahos could not be considered willing because Tzolis had concealed material information from them such as his negotiations with Extell.

The motion court granted the motion. It found that under both Delaware law and New York law, plaintiffs had no cause of action. The court found that paragraph 11 of the operating agreement "eliminates the fiduciary relationship that would, otherwise, be owed by the members to each other and to the LLC." The court noted that, contrary to plaintiffs' contention, paragraph 11 could not be reasonably construed as limiting the

types of business opportunities a member of Vrahos could enter into for his exclusive benefit to those that did not exploit the assets of Vrahos itself. The court also stated that, to the extent paragraph 11 of the operating agreement eliminated certain fiduciary duties amongst the members, it was not unlawful or against public policy. The court relied on this reasoning, and the fact that plaintiffs failed to identify any contractual provision that Tzolis violated, in finding that plaintiffs' claims for breach of fiduciary duty, misappropriation and breach of contract failed to state a cause of action.

As to their claims for conversion and unjust enrichment, the court noted plaintiffs' willing sale of their interests in Vrahos. As to the fraud cause of action, the court stated that plaintiffs could prevail only if, under the "special facts" doctrine, they established that Tzolis had such superior knowledge of the relevant facts that it was inherently unfair for him not to disclose them. The court found that plaintiffs failed to sufficiently allege that, through the use of ordinary diligence, they could not have discovered that Tzolis had been negotiating to achieve a significant profit through the assignment of the lease to Extell. Further, the court determined that since the fraud allegations were based on information and belief, they were inadequate to support a fraud claim. Finally, the court found that plaintiffs did not have standing to assert a derivative claim on behalf of Vrahos, since, at the time they brought the complaint, they no longer had an interest in the entity.

As the movant on this pre-answer motion to dismiss, Tzolis had the burden of "clearly" establishing that paragraph 11 of the operating agreement eliminated the particular fiduciary duty that plaintiffs contend he breached (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 153 [2002]). Further, in considering whether Tzolis demonstrated that plaintiffs have not stated the various causes of action they assert in their complaint, we are required to accept the facts as alleged as true, "accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]).

Paragraph 11 of the operating agreement may have permitted Tzolis to pursue a business opportunity unrelated to Vrahos, for his exclusive benefit, without having to disclose it to plaintiffs or otherwise present it first to Vrahos. However, we find that the provision does not "clearly" permit Tzolis to engage in behavior such as that alleged here, which was to surreptitiously engineer the lucrative sale of *the sole asset owned by Vrahos,*

without informing his fellow owners of that entity. Thus, guided by the principles, enunciated above, that apply on a CPLR 3211 motion to dismiss, we find that Tzolis failed to meet his burden of establishing that the provision extended that far.

Even under Delaware law, which permits parties to a limited liability company agreement such as this one to eliminate traditional fiduciary duties (Del Code Ann tit 6, § 18-1101 [c]), Tzolis has not established that the parties eliminated all fiduciary duties that they owed to each other. That is because, under Delaware law, "unless the LLC agreement in a manager-managed LLC *explicitly* . . . restricts, or eliminates traditional fiduciary duties, managers owe those duties to . . . [the LLC's] members" (*Kelly v Blum*, 2010 WL 629850, *10, 2010 Del Ch LEXIS 31, *44 [2010] [emphasis added]). Accordingly, plaintiffs have adequately alleged that Tzolis breached a fiduciary duty to keep them informed of any and all opportunities he was pursuing on behalf of Vrahos.

We turn now to the effect of the certificate signed by plaintiffs, in which they acknowledged that the assignments of their interests in Vrahos were not based on any representations by Tzolis and that Tzolis owed them no fiduciary duties whatsoever. This Court addressed that very issue in *Blue Chip Emerald v Allied Partners* (299 AD2d 278 [2002]), a case with very similar facts. In *Blue Chip*, the parties were joint venturers who formed an entity for the sole purpose of owning a commercial building. The plaintiffs sold their interests in the entity to the defendants based on a valuation of the building that was a small fraction of the price that the defendants received when they sold the building two weeks later. The plaintiffs commenced an action, sounding in breach of fiduciary duty and fraud, to recover what they claimed they should have been paid based on the actual sale price of the building. The motion court granted the defendants' motion to dismiss, because the plaintiffs had executed a buyout agreement in which they acknowledged that they were not relying on any warranties or representations and that they had been afforded an opportunity to conduct due diligence, and in which they disclaimed any claim for breach of fiduciary duty or fraud in connection with the sale.

This Court reversed, stating as follows: "The key fact overlooked by the IAS court is that the . . . defendants, as coventurers and, in particular, as managing coventurers, were fiduciaries of [the entity] in matters relating to the Venture until the moment the buy-out transaction closed, and therefore owe[d] [the entity] a duty of undivided and undiluted loyalty. Consistent with this stringent standard of conduct, which the

courts have enforced with [u]ncompromising rigidity, it is well established that, when a fiduciary, in furtherance of its individual interests, deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make full disclosure of all material facts. Stated otherwise, the fiduciary is obligated in negotiating such a transaction to disclose any information that could reasonably bear on [the beneficiary's] consideration of [the fiduciary's] offer. Absent such full disclosure, the transaction is voidable" (299 AD2d at 279-280 [internal quotation marks and citations omitted]).

We found that, pursuant to these principles, the defendants in *Blue Chip* had an obligation, in negotiating the buyout agreement, to divulge to the plaintiffs "material facts concerning their efforts to sell or lease the Venture's Property, such as, for example, the prices prospective purchasers were offering to pay" (*id.* at 280). This obligation attached even though the plaintiffs were commercially sophisticated (*id.*).

There is no discernible difference in the facts of this case, and we are compelled to act with the same uncompromising rigidity here as in *Blue Chip*. Thus, notwithstanding the certificate in which plaintiffs acknowledged performing their own due diligence and stated that "Tzolis has no fiduciary duty to the undersigned Sellers in connection with such assignments," we find that Tzolis had an overriding duty to disclose his dealings with Extell to plaintiffs before they assigned their interests in Vrahos to him. Indeed, as this Court stated in *Blue Chip*, "[A] fiduciary cannot by contract relieve itself of the fiduciary obligation of full disclosure by withholding the very information the beneficiary needs in order to make a reasoned judgment whether to agree to the proposed contract" (299 AD2d at 280).

Although the case is not relied on by Tzolis, the dissent cites *Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.* (17 NY3d 269 [2011], *affg* 76 AD3d 310 [2010]) as support for its position that the certificate effectively released Tzolis from the claims now at issue. However, *Centro* is distinguishable. In that case, the plaintiffs alleged that the defendants, their cofiduciaries, induced them to sell their interest in a telecommunications company by misrepresenting the value of the enterprise. The Court of Appeals, in affirming the dismissal of the plaintiffs' fraud claim, noted that the "plaintiffs knew that defendants had not supplied them with the financial information necessary to properly value [their interest], and that they were entitled to that information . . . In short, this is an instance where plaintiffs 'have been so lax in protecting themselves that they cannot fairly ask for the law's protec-

tion' " (17 NY3d at 279, quoting *DDJ Mgt., LLC v Rhone Group L.L.C.*, 15 NY3d 147, 154 [2010]). The Court further noted that the plaintiff "ha[d] actual knowledge that its fiduciary [was] not being entirely forthright" (*id.*). In contrast, defendants here have made no showing that plaintiffs had any reason to suspect Tzolis of deceit or that they had the independent ability to discover facts that would have deterred them from selling their interests in Vrahos to him.

Moreover, *Centro* involved an exceedingly broad release that extinguished defendants' liability in "all manner of actions . . . whatsoever . . . whether past, present or future . . . resulting from the ownership of membership interests in [the entity] or having taken or failed to take any action in any capacity on behalf of [the entity] or in connection wit the business of [the entity]" (*id.* at 274). No such document was signed by plaintiffs here.

To the extent that, as the dissent notes, the Court of Appeals criticized *Blue Chip* in *Centro*, it is irrelevant here. The criticism was that *Blue Chip* may suggest that this Court disagreed with the proposition that "[a] sophisticated principal is able to release its fiduciary from claims—*at least where . . . the fiduciary relationship is no longer one of unquestioning trust*—so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into" (17 NY3d at 278 [emphasis added]). Here, the dissent points to no evidence that plaintiffs and Tzolis were not still in a relationship of unquestioning trust at the time of the transaction at issue, other than employing the circular logic that they must not have had such a relationship given that plaintiffs were willing to execute the certificate.

We further acknowledge this Court's decision in *Arfa v Zamir* (76 AD3d 56 [2010], *affd* 17 NY3d 737 [2011]), also not cited by Tzolis, which was similar to *Centro* insofar as, notwithstanding the fiduciary relationship between the parties, it dismissed a fraud claim based on allegations that the defendants induced the plaintiffs to invest in a building with them by misrepresenting certain material facts. However, *Arfa*, like *Centro*, is distinguishable from this case insofar as there was a broad release, the parties' relationship by the time of the alleged fraud had deteriorated to a high level of distrust, and the plaintiffs had received "hints of . . . falsity" from the defendants (76 AD3d at 62 [internal quotation marks and citation omitted]). It is notable that this Court in *Arfa* distinguished *Blue Chip* based on those same facts.

Accordingly, we conclude that the motion court erred in

dismissing plaintiffs' claims for breach of fiduciary duty and fraud. With respect to the latter cause of action, we note that while the complaint's allegations, insofar as they were made upon information and belief, may have been insufficient, plaintiffs cured any defect by making particular allegations of fraud in Pappas's affidavit in opposition to the motion (*see Cron v Hargro Fabrics*, 91 NY2d 362, 366 [1998]). The dissent contends that the fraud and misrepresentation claim should be dismissed because "Pappas and Ifantopoulos did not ask Tzolis why he was offering them 20 times more than what they had invested in Vrahos one year earlier." However, the dissent is ignoring the basic precepts that must be followed on a motion to dismiss and applying a standard that is more suitable to summary judgment. Accepting the facts as alleged as true and according plaintiffs the benefit of every possible favorable inference, we find that plaintiffs have alleged enough to permit them to develop a full record on the issue whether they acted reasonably.

As for plaintiffs' causes of action for conversion and unjust enrichment, we reinstate them based on our finding that, because of Tzolis's surreptitious behavior, plaintiffs did not sell their interests in Vrahos willingly or at arm's length. Plaintiffs are entitled to litigate their claims that Tzolis's wrongful behavior constituted a conversion of a portion of their interests in Vrahos and that equity dictates that Tzolis return the corresponding value to them.

The remaining claims, however, were correctly dismissed. Plaintiffs allege in their second cause of action that Tzolis misappropriated a business opportunity by assigning the lease to Extell. However, it was Vrahos, not Tzolis, that assigned the lease. The court also correctly dismissed the breach of contract cause of action because of plaintiffs' failure to allege specifically what the violation was (*see Gordon v Curtis*, 68 AD3d 549, 550 [2009], *lv denied* 14 NY3d 713 [2010]). The related claim for breach of the implied covenant of good faith and fair dealing was also correctly dismissed because such a claim cannot be used to create independent contractual rights (*see National Union Fire Ins. Co. of Pittsburgh, Pa. v Xerox Corp.*, 25 AD3d 309, 310 [2006], *lv dismissed* 7 NY3d 886 [2006]).

Because the claim for breach of contract has been dismissed, plaintiffs cannot state a cause of action for tortious interference with contract (*see e.g. NBT Bancorp v Fleet/Norstar Fin. Group*, 87 NY2d 614, 620-621 [1996]). On appeal, plaintiffs seek to recast this claim as one for tortious interference with prospective business opportunities. Even if we were to consider this

belated change, we would find that this claim fails to state a cause of action (see *Carvel Corp. v Noonan*, 3 NY3d 182, 192 [2004]).

Because plaintiffs' assignments of their interests in Vrahos may be voidable, they have standing to assert a derivative claim on Vrahos's behalf. However, on the merits, the eleventh cause of action was correctly dismissed, since it was contradicted both by other allegations in the complaint and by the documentary evidence, which shows that Vrahos received $17,500,000 from the assignment of its lease. Concur—Mazzarelli, J.P., Saxe and Acosta, JJ.

Friedman and Freedman, JJ., dissent in a memorandum by Freedman, J., as follows: I would affirm the dismissal of the complaint in its entirety, because contractual disclaimers by plaintiffs preclude the causes of action that the majority has reinstated.

The complaint alleges as follows: In January 2006, plaintiffs Steve Pappas and Constantine Ifantopoulos and defendant Steve Tzolis formed a Delaware limited liability company, Vrahos LLC, as a vehicle for entering into a 49-year lease of a commercial building in Manhattan, and operating and developing the property. Pursuant to Vrahos's operating agreement, also executed in January 2006, Pappas, Ifantopoulos, and Tzolis were named as the company's sole members and managers, with Pappas and Tzolis each holding a 40% interest and making a $50,000 capital contribution and Ifantopoulos holding a 20% interest and making a $25,000 contribution.

According to the complaint, Tzolis assumed Vrahos's control and management, and, with plaintiffs' consent, Vrahos subleased the Manhattan property to Tzolis in June 2006 for $20,000 per month. In late 2006, Tzolis approached Pappas and Ifantopoulos about buying out their interests in Vrahos. According to the complaint, Tzolis's given reason for the buyout was that "he [did] not want to pay rent" and that "he owns his own buildings." But by this time, plaintiffs allege, Tzolis knew of but did not disclose a profitable opportunity for Vrahos to assign its lease interest to nonparty Charlton Soho LLC, a real estate developer.

On January 18, 2007, the parties executed closing documents pursuant to which, after the fulfillment of certain conditions, Pappas and Ifantopoulos would assign their interests in Vrahos to Tzolis, in exchange for which Tzolis would pay Pappas $1 million and Ifantopoulos $500,000, or 20 times what they had invested one year earlier. At the closing, the complaint acknowledges, Pappas, Ifantopoulos, and Tzolis executed a certificate

stating that each of the plaintiffs "has performed [his] own due diligence in connection with [his] assignment[ ]," and that each of them "has engaged its own legal counsel, and is not relying on any representation by Steve Tzolis or any of his agents or representatives, except as set forth in the assignments & other documents delivered to [Pappas and Ifantopoulos] today." The certificate further stated that "Steve Tzolis has no fiduciary duty to [Pappas and Ifantopoulos] in connection with [the] assignments."

The transaction was consummated and the assignments completed on February 20, 2007. About six months later, in late August 2007, Tzolis, now Vrahos's sole member, assigned the Vrahos lease to Charlton Soho for $17.5 million, thus realizing a very large profit on his investment in the LLC. Plaintiffs' central allegation against Tzolis is that he cheated Pappas and Ifantopoulos out of a share of the profit from the Charlton Soho deal by buying out their interests in Vrahos without disclosing to them that a potential deal was in the offing.

I agree with the majority that, for the reasons stated, Supreme Court correctly dismissed plaintiffs' claims for breach of the operating agreement, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, and misappropriation of business opportunities. I also agree that the cause of action asserting a derivative claim was correctly dismissed on the merits.

The remaining causes of action for breach of fiduciary duty (first cause of action), conversion (fourth), unjust enrichment (fifth), and fraud and misrepresentation (tenth) also should have been dismissed. Pappas and Ifantopoulos allege that Tzolis breached his fiduciary duty to them by buying their LLC interests without telling them about what they contend were ongoing negotiations with Charlton Soho. The terms of the closing certificate, however, preclude that claim. In the certificate, Pappas and Ifantopoulos explicitly agreed that Tzolis had no fiduciary duty to them in connection with the assignment, stated that they were not relying on Tzolis' external representations, and represented that they had protected their interests by performing due diligence and engaging separate counsel. Although Tzolis had a fiduciary relationship with Pappas and Ifantopoulos before the closing, the certificate specifically discharged that fiduciary relationship and released Tzolis from any liability arising from his fiduciary duty.

Moreover, a provision in the original operating agreement for the LLC anticipated competing interests among the LLC members. The agreement provides that "[a]ny [m]ember may

engage in business ventures and investments *of any nature whatsoever*, whether or not in competition with the LLC, *without obligation of any kind* . . . to the other [m]embers" (emphasis supplied). Under Delaware law, which, as the majority points out, governs the breach of fiduciary duty claim, an LLC member's fiduciary duty to another member "may be expanded or restricted or eliminated by provisions in the limited liability company agreement" (Del Code Ann tit 6, § 18-1101 [c]). While the operating agreement provision alone did not eliminate all of Tzolis's fiduciary duties to Pappas and Ifantopoulos, it afforded Tzolis latitude to pursue his individual business interests for his own gain regardless of his comembers' interests.

The Court of Appeals recently held that "[a] sophisticated principal is able to release its fiduciary from claims—at least where . . . the fiduciary relationship is no longer one of unquestioning trust—so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into" (*Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*, 17 NY3d 269, 278 [2011], *affg* 76 AD3d 310 [2010]). In *Centro Empresarial*, the plaintiffs, who were minority shareholders in a closely held corporation, claimed that the defendant majority shareholder and its affiliates fraudulently induced them both to sell their shares (by misrepresenting their value) and to execute a broad release from claims. The defendant was the plaintiffs' fiduciary and therefore was required to "disclose any information that could reasonably bear on plaintiffs' consideration of [its purchase] offer" (*id.*, quoting *Dubbs v Stribling & Assoc.*, 96 NY2d 337, 341 [2001]). Despite that fiduciary obligation, the Court of Appeals held that the plaintiffs' claims, which included breach of fiduciary duty, fraud, and unjust enrichment, were barred by the release they granted defendants as a condition of the sale (*see also Global Mins. & Metals Corp. v Holme*, 35 AD3d 93, 98 [2006], *lv denied* 8 NY3d 804 [2007]).

In this case, plaintiffs were business partners of Tzolis who affirmed at the closing and in connection with the assignments that they were represented by counsel and had performed their own due diligence in connection with the transaction. Their acknowledgment in the closing certificate that Tzolis was not acting as their fiduciary and that they were not relying on any representations by him beyond those contained in the closing documents, constituted fair notice that plaintiffs were engaging in an arm's length business transaction with Tzolis, that they should not place their "unquestioning trust" in him, and that in exchange for their immediate and certain twentyfold return

on their investment, they were forgoing the possibility of future greater profit.

The majority's reliance on *Blue Chip Emerald v Allied Partners* (299 AD2d 278 [2002]) as support for its holding that, despite plaintiffs' disclaimers, Tzolis had an "overriding [fiduciary] duty to disclose" is misplaced. In *Centro Empresarial*, the Court of Appeals made clear that one party could release another from claims arising from a fiduciary duty that existed before the release, and called our holding in *Blue Chip Emerald* into question by stating that "[t]o the extent that Appellate Division decisions such as . . . *Blue Chip Emerald* . . . suggest otherwise, they misapprehend our case law" (17 NY3d at 278).

The majority's attempt to distinguish *Centro Empresarial* from this case is unpersuasive. It is immaterial that instead of signing a general release plaintiffs executed a certificate disclaiming Tzolis's fiduciary duty and his earlier representations. The disclaimer was tantamount to a release from all claims against Tzolis in connection with the assignment that were premised on his fiduciary duty to plaintiffs.

The majority also contends that Tzolis made no showing that plaintiffs lacked "unquestioning trust" in him. The face of the closing certificate, however, indicates otherwise. In consideration of Tzolis's purchase, plaintiffs were presented with, and with the advice of counsel signed, an explicit acknowledgment that Tzolis was not their fiduciary and that they should not rely on his earlier representations. Even if plaintiffs had the right to place their trust in Tzolis before they signed the certificate, that right necessarily ended when they executed it. Accordingly, the breach of fiduciary duty claim is barred.

The fraud and misrepresentation claim also fails. The gist of plaintiffs' allegations is that Tzolis failed to disclose that he was negotiating the lease assignment, not that he actually made any misrepresentations about it. New York law, which governs the operating agreement, adopts the "special facts" doctrine that, in the absence of a fiduciary relationship between parties to a transaction, a duty to disclose only arises where one party's superior knowledge of relevant facts is such that nondisclosure would render the transaction unfair (*see Jana L. v West 129th St. Realty Corp.*, 22 AD3d 274, 277 [2005]). However, that doctrine only applies if the party lacking the relevant facts could not have acquired them by using ordinary intelligence (*id.* at 278). Tzolis's substantial offer to plaintiffs should have alerted them to the fact that some deal was in the offing. Pappas and Ifantopoulos did not ask Tzolis why he was offering them 20 times more than what they had invested in Vrahos one year

earlier; their lack of due diligence is unreasonable as a matter of law and fatal to plaintiffs' claim.

Finally, since Pappas and Ifantopoulos received their bargained-for consideration in exchange for their LLC interests, and the transaction was unaffected by a fiduciary relationship, the conversion and unjust enrichment claims fail.