Opinion by Judge MCKEOWN; Concurrence by Judge WATFORD; Dissent by Judge KOZINSKI.
OPINION
McKEOWN, Circuit Judge:
In this case, a heartfelt plea for personal protection is juxtaposed with the limits of copyright law and fundamental principles of free speech. The appeal teaches a simple lesson — a weak copyright claim cannot justify censorship- in the guise of authorship.
By all accounts, Cindy Lee Garcia was bamboozled when a movie producer transformed her five-second acting performance into .part of a blasphemous video proclamation against the Prophet Mohammed.[1] The producer — now in jail on unrelated matters — uploaded a trailer of the film, Innocence of Muslims, to YouTube. Mil *737 lions of viewers soon watched it online, according to Garcia. News outlets credited the film as a source of violence in the Middle East. Garcia received death threats.
Asserting that she holds a copyright interest in her fleeting performance, Garcia sought a preliminary injunction requiring Google to remove the film from all of its platforms, including YouTube. The district court denied the injunction, finding that Garcia did not establish likely success on the merits for her copyright claim. Nor did she demonstrate that the injunction would prevent any alleged harm in light of the film’s five-month presence on the Internet. A divided panel of our court reversed, labeled her copyright claim as “fairly debatable,” but then entered a mandatory injunction requiring Google to remove the film. That injunction was later limited to versions of the film featuring Garcia’s performance.
As Garcia characterizes it, “the main issue in this case involves the vicious frenzy against Ms. Garcia that the Film caused among certain radical elements of the Muslim community.” We are sympathetic to her plight. Nonetheless, the claim against Google is grounded in copyright law, not privacy, emotional distress, or tort law, and Garcia seeks to impose speech restrictions under copyright laws meant to foster rather than repress free expression. Garcia’s theory can be likened to “copyright cherry picking,” which would enable any contributor from a costume designer down to an extra or best boy to claim copyright in random bits and pieces of a unitary motion picture without satisfying the requirements of the Copyright Act. Putting aside the rhetoric of Hollywood hijinks and the dissent’s dramatics, this case must be decided on the law.
In light of the Copyright Act’s requirements of an “original work[ ] of authorship fixed in any tangible medium,” 17 U.S.C. § 102(a), the mismatch between Garcia’s copyright claim and the relief sought, and the Copyright Office’s rejection of Garcia’s application for a copyright in her brief performance, we conclude that the district court did not abuse its discretion in denying Garcia’s request for the preliminary injunction. As a consequence, the panel’s mandatory injunction against Google was unjustified and is dissolved upon publication of this opinion.
Background and Procedural History
In July 2011, Cindy Lee Garcia responded to a casting call for a film titled Desert Warrior, an action-adventure thriller set in ancient Arabia. Garcia was cast in a cameo role, for which she. earned $500. She received and reviewed a few pages of . script. Acting under a professional director hired to oversee production, Garcia spoke two sentences: “Is George crazy? Our daughter is but a child?” Her role was to deliver those lines and to “seem[ ] concerned.”
Garcia later discovered that writer-dir rector Mark Basseley Youssef (a.k.a. Nak-oula Basseley Nakoula or Sam Bacile) had a different film in mind: an anti-Islam polemic renamed Innocence of Muslims. The film, featuring a crude production, depicts the Prophet Mohammed as, among other things, a murderer, pedophile, and homosexual. Film producers dubbed over Garcia’s lines and replaced them with a voice asking, “Is your Mohammed a child molester?” Garcia appears on screen for only five seconds.
Almost a year after the casting call, in June 2012, Youssef uploaded a 13-minute- and-51-second trailer of Innocence of Muslims to YouTube, the video-sharing website owned by Google, Inc., which boasts a global audience of more than one *738 billion visitors per month.[2] After it was translated into Arabic, the film fomented outrage across the Middle East, and media reports linked it to numerous violent protests. The film also has been a subject of political controversy over its purported connection to the September 11, 2012, attack on the United States Consulate in Benghazi, Libya.
Shortly after the Benghazi attack, an Egyptian cleric issued a fatwa against anyone associated with Innocence of Muslims, calling upon the “Muslim Youth in Amer-iea[ ] and Europe” to “kill the director, the producer!,] and the actors and everyone who helped and promoted this film.” Garcia received multiple death threats.
Legal wrangling ensued. Garcia asked Google to remove the film, asserting it was hate speech and violated her state law rights to privacy and to control her likeness. Garcia also sent Google five take-down notices under the Digital Millenium Copyright Act, 17 U.S.C. § 512, claiming that YouTube’s broadcast of Innocence of Muslims infringed her copyright in her “audio-visual dramatic performance.” Google declined to remove the film.
On September 19, 2012, Garcia first sued Google, Youssef, and other unnamed production assistants in Los Angeles Superior Court. Her complaint alleged a compendium of torts and assorted wrongdoing under California law. As against Google, Garcia made claims for invasion of privacy, false light, and violating her right to publicity. She brought the same claims against Youssef and added fraud, unfair business practices, slander, and intentional infliction of emotional distress. The state court denied Garcia’s motion for a “temporary restraining order and for an order to show cause re preliminary injunction,” because she had “not shown a likelihood of success on the merits.” On September 25, 2012, Garcia voluntarily dismissed her state court suit.
One day later, Garcia turned to federal court. She filed suit in the United States District Court for the Central District of California and again named Google and Youssef as codefendants. Garcia alleged copyright infringement against both defendants and revived her state law claims against Youssef for fraud, unfair business practices, libel, and intentional infliction of emotional distress.
Garcia then moved for a temporary restraining order and for an order to show cause on a preliminary injunction — but only on the copyright claim. She sought to bar Google from hosting Innocence of Muslims on YouTube or any other Google-run website.
On November 30, 2012, the district,court denied Garcia’s motion for a preliminary injunction. As an initial matter, the court concluded that “Garcia ha[d] not demonstrated that the requested relief would prevent any alleged harm,” because, by that point, the film trailer had been on the Internet for five months. Nor did Garcia establish a likelihood of success on the merits. In particular, the district court found that the nature of Garcia’s copyright interest was unclear, and even if she could establish such a copyright, she granted the film directors an implied license' to “distribute her performance as a contribution incorporated into the indivisible whole of the Film.”
A divided panel of our court reversed. More than a year and a half after the film was first uploaded, the panel majority first *739 issued a secret takedown order, giving Google twenty-four hours to remove all copies of Innocence of Muslims from YouTube and other Google-controlled platforms. The panel embargoed disclosure of the order until it issued its opinion. The panel later amended the order to allow YouTube to post any version of the film that did not include Garcia’s performance.
In its later-issued opinion, the panel majority reversed the district court and granted 'Garcia’s preliminary injunction. Garcia v. Google, Inc., 743 F.3d 1258, amended by Garcia v. Google, Inc., 766 F.3d 929 (9th Cir.2014). Despite characterizing Garcia’s copyright claim as “fairly debatable,” the panel majority nonetheless concluded that Garcia was likely to prevail on her copyright claim as to her individual performance in Innocence of Muslims. 766 F.3d at 935. In contrast to the district court’s factual finding of an implied license from Garcia to Youssef, the panel opinion held that the license ran in the opposite direction: ‘Youssef implicitly granted [Garcia] a license to perform his screenplay,” and that Garcia did not grant Yous-sef an implied license to incorporate her performance into the film. Id. at 935-38. Finally, the panel majority held that, because of the death threats against her, Garcia had established irreparable harm and the equities and public interest favored an injunction. Id. at 938-40. The opinion did not address the First Amendment consequences of the mandatory take-down injunction, beyond stating that the First Amendment does not protect copyright infringement.
Judge N.R. Smith dissented. He wrote that Garcia had not met the high burden required for a mandatory preliminary injunction because she was unlikely to succeed on her copyright claim. Id. at 941 (N.R. Smith, J., dissenting). Specifically, Garcia was not likely to prove her performance was a “work,” nor would she likely meet the copyright requirements of authorship and fixation, among other shortcomings with her claim. Id. at 946. In sum, “[bjecause the facts and law do not ‘clearly favor’ issuing a preliminary injunction to Garcia, the district court did not abuse its discretion in denying Garcia’s requested relief.” Id. at 940.
We granted rehearing en banc.[3] Garcia v. Google, Inc., 771 F.3d 647 (9th Cir.2014).
ANALYSIS
I. The District Court’s Decision
Garcia sued under a slew of legal theories, but she moved for a preliminary injunction on just one of them: the copyright claim. Hence, copyright is the only basis for the appeal. Garcia’s tort allegations — and claimed harm resulting from those torts, such as emotional distress — do not figure into our analysis.
We begin with the basics.
The district court’s order denying Garcia’s motion for a preliminary injunction is reviewed for abuse of discretion. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir.2011). Because our review is deferential, “[w]e will not reverse the district court where it ‘got the law right,’ even if we ‘would have arrived at a different result,’ so long as the district court did not clearly err in its factual determinations.” Id. (internal citation omitted).
*740 The Supreme Court has emphasized that preliminary injunctions are an “extraordinary remedy never awarded as of right.” Winter v. NRDC, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The district court correctly identified that Garcia must satisfy Winter’s four-factor test. “A plaintiff seeking a preliminary' injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest.” Farris v. Seabrook, 677 F.3d 858, 864 (9th Cir.2012) (citing Winter, 555 U.S. at 20, 129 S.Ct. 365).
The first factor under Winter is the most important — likely success on the merits. Aamer v. Obama, 742 F.3d 1023, 1038 (D.C.Cir.2014) (“We begin with the first and most important factor: whether petitioners have established a likelihood of success on the merits.”). Because it is a threshold inquiry, when “a plaintiff has failed to show the likelihood of success on the merits, we ‘need not consider the remaining three [Winter elements].’ ” Ass’n des Eleveurs de Canards et d’Oies du Quebec v. Harris, 729 F.3d 937, 944 (9th Cir.2013) (quoting DISH Network Corp. v. F.C.C., 653 F.3d 771, 776-77 (9th Cir.2011)).
Garcia’s burden here is doubly demanding: Because Garcia seeks a mandatory injunction, she must establish that the law and facts clearly favor her position, not simply that she is likely to succeed.
Why? Garcia’s requested injunction required Google to take affirmative action — to remove (and to keep removing) Innocence of Muslims from YouTube and other sites under its auspices, whenever and by whomever the film was uploaded. This relief is treated as a mandatory injunction, because it “orders a responsible party to ‘take action.’ ” Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir.2009) (citation omitted). As we have cautioned, a mandatory injunction “goes well beyond simply maintaining the status quo penden-te lite [and] is particularly disfavored.”[4] Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir.1994) (internal citations omitted). The “district court should deny such relief ‘unless the facts and law clearly favor the moving party.’ ” Id. (quoting Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir.1979)). In plain terms, mandatory injunctions should not issue in “doubtful cases.” Park Vill. Apartment Tenants Ass’n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir.2011);
As we shall see, the district court did not abuse its discretion in concluding that Garcia was not likely to succeed on her copyright claim — much less that the law and facts clearly compel suppression of a controversial and politically significant film.
A. Copyright
The central question is whether the law and facts clearly favor Garcia’s claim to a copyright in her five-second acting performance as it appears in Innocence of Muslims. The answer is no. This conclusion does not mean that a plaintiff like Garcia is without options or that she *741 couldn’t have sought an injunction against different parties or on other legal theories, like the right of publicity and defamation.[5]
Under the Copyright Act, “[cjopyright protection subsists ... in original works of authorship fixed in any tangible medium of expression ... [including] motion pictures.” 17 U.S.C. § 102(a). That fixation must be done “by or under the authority of the author.” 17 U.S.C. § 101. Bench-marked against this statutory standard, the law does not clearly favor Garcia’s position.
The statute purposefully left “works of authorship” undefined to provide for some flexibility. See 1 Nimmer on Copyright § 2.03. Nevertheless, several other provisions provide useful guidance. An audiovisual work is one that consists of “a series of related images which are intrinsically intended to be shown” by machines or other electronic equipment, plus “accompanying sounds.” 17 U.S.C. § 101. In turn, a “motion picture” is an “audiovisual work[] consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any.” Id. These two definitions embody the work here: Innocence of Muslims is ah audiovisual work that is categorized as a motion picture and is derivative of the script. Garcia is the author of none of this and makes no copyright claim to the film or to the script.[6] Instead, Garcia claims that her five-second performance itself merits copyright protection.
In the face of this statutory scheme, it comes as no surprise that during this litigation, the Copyright Office found that Garcia’s performance was not a copyrightable work when it rejected her copyright application. The Copyright Office explained that its “longstanding practices do not allow a copyright claim by an individual actor or actress in his or her performance contained within a motion picture.” Thus, “[f]or copyright registration purposes, a motion picture is a single integrated work.... Assuming Ms. Garcia’s contribution was limited to her acting performance, we cannot register her performance apart from the motion picture.”
We credit this expert opinion of the Copyright Office — the office charged with administration and enforcement of the copyright laws and registration.[7] See Inhale, Inc. v. Starbuzz Tobacco, Inc., 755 F.3d 1038, 1041-42 (9th Cir.2014). The Copyright Office’s well-reasoned position *742 “reflects a ‘body of experience and informed judgment to which courts and litigants may properly resort for guidance.’ ” Southco, Inc. v. Kanebridge Corp., 390 F.3d 276, 286 n. 5 (3d Cir.2004) (en banc) (Alito, J.) (quoting Yates v. Hendon, 541 U.S. 1, 3, 124 S.Ct. 1330, 158 L.Ed.2d 40 (2004)).[8]
In analyzing whether the law clearly favors Garcia, Aalmuhammed v. Lee, 202 F.3d 1227 (9th Cir.2000), provides a useful foundation. There, we examined the meaning of “work” as the first step in analyzing joint authorship of the movie Malcolm X. The Copyright Act provides that when a work is “prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole,” the work becomes a “joint work” with two or more authors. 17 U.S.C. § 101 (emphasis added). Garcia unequivocally disclaims joint authorship of the film.
In Aalmuhammed, we concluded that defining a “work” based upon “some minimal level of creativity or originality ... would be too broad and indeterminate to be useful.”[9] 202 F.3d at 1233 (internal quotation marks omitted). Our animating concern was that this definition of “work” would fragment copyright protection for the unitary film Malcolm X into many little pieces:
So many people might qualify as an “author” if the question were limited to whether they made a substantial creative contribution that that test would not distinguish one from another. Everyone from the producer and director to casting director, costumer, hairstylist, and “best boy” gets listed in the movie credits because all of their creative contributions really do matter.

Id.

Garcia’s theory of copyright law would result in the legal morass we warned against in Aalmuhammed — splintering a movie into many different “works,” even in the absence of an independent fixation. Simply put, as Google claimed, it “make[s] Swiss cheese of copyrights.”.
Take, for example, films with a large cast — the proverbial “cast of thousands” [10] —such as Benr-Hur or Lord of the Rings.[11] *743 The silent epic Ben-Hur advertised a cast of 125,000 people. In the Lord of the Rings trilogy, 20,000 extras tramped around Middle-Earth alongside Frodo Baggins (played by Elijah Wood). Treating every acting performance as an independent work would not only be a logistical and financial nightmare, it would turn cast of thousands into a new mantra: copyright of thousands.
The dissent spins speculative hypotheti-cals about copyright protection for book chapters, movie outtakes, baseball games, and Jimi Hendrix concerts. See Dissent at 749-50, 751. This hyperbole sounds a false alarm. Substituting moral outrage and colorful language for legal analysis, the dissent mixes and matches copyright concepts such as collective works, derivative works, the requirement of fixation, and sound recordings. The statutory definitions and their application counsel precision, not convolution. See, e.g., 17 U.S.C. §§ 101, 103, 114, 201. The citation to Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir.1990) (Kozinski, J.), is particularly puzzling. There, neither party disputed the plaintiffs copyright, and the plaintiff independently fixed the special-effects footage and licensed it to the filmmakers. See id. at 556 n. 2
The reality is that contracts and the work-made-for-hire doctrine govern much of the big-budget Hollywood performance and production world. See 1 Nimmer on Copyright § 6.07[B][2], Absent these formalities, courts have looked to implied licenses. See Effects Assocs., 908 F.2d at 559-60. Indeed, the district court found that Garcia granted Youssef just such an implied license to incorporate her performance into the film.[12] But these legal niceties do not necessarily dictate whether something is protected by copyright, and licensing has its limitations. As filmmakers warn, low-budget films rarely use licenses. Even if filmmakers diligently obtain licenses for everyone on set, the contracts are not a panacea. Third-party content distributors, like YouTube and Netflix, won’t have easy access to the licenses; litigants may dispute their terms and scope; and actors and other content contributors can terminate licenses after thirty five years. See 17 U.S.C. § 203(a)(3). Untangling the complex, difficult-to-access, and often phantom chain of title to tens, hundreds, or even thousands of standalone copyrights is a task that could tie the distribution chain in knots. And filming group scenes like a public parade, or the 1963 March on Washington, would pose a huge burden if each of the thousands of marchers could claim an independent copyright.
Garcia’s copyright claim faces yet another statutory barrier: She never fixed her acting performance in a tangible medium, as required by 17 U.S.C. § 101 (“A work is ‘fixed’ in a tangible medium of expression when its embodiment in a copy or phono-record, by or under the authority of the author, is sufficiently permanent or stable *744 to permit it to be perceived, reproduced, or otherwise communicated. for a period of more than transitory duration.”) (emphasis added). According to the Supreme Court, “the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection.” Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). Garcia did nothing of the sort.[13]
For better or for worse, Youssef and his crew “fixed” Garcia’s performance in the tangible medium, whether in physical film or in digital form. However one might characterize Garcia’s performance, she played no role in fixation. On top of this, Garcia claims that she never agreed to the film’s ultimate rendition or. how she was portrayed in Innocence of Muslims, so she can hardly argue that the film or her cameo in it was fixed “by or under [her] authority.” 17 U.S.C. § 101.
In sum, the district court committed no error in its copyright analysis. Issuance of the mandatory preliminary injunction requires more than a possible or fairly debatable claim; it requires a showing that the law “clearly favor[s]” Garcia. See Stanley, 13 F.3d at 1320. Because neither the Copyright Act nor the Copyright Office’s interpretation supports Garcia’s claim, this is a hurdle she cannot clear.
B. Irreparable Harm
Although we could affirm the district court solely on the copyright issue, see DISH Network, 653 F.3d at 776-77, we address irreparable harm because the grave danger Garcia claims cannot be discounted and permeates the entire lawsuit.
At first blush, irreparable harm looks like Garcia’s strongest argument. Garcia understandably takes seriously the fatwa and threats against her and her family, and so do we. The difficulty with Garcia’s claim is that there is a mismatch between her substantive copyright claim and the dangers she hopes to remedy through an injunction. Garcia seeks a preliminary injunction under copyright law, not privacy, fraud, false light or any other tort-based cause of action. Hence, Garcia’s harm must stem from copyright — namely, harm to her legal interests as an author. Salinger v. Colting, 607 F.3d 68, 81 & n. 9 (2d Cir.2010) (“The relevant harm is the harm that ... occurs to the parties’ legal interests. ...”).
Looking to the purpose of copyright underscores the disjunction Garcia’s case presents. Article 1, Section 8 of the U.S. Constitution provides that copyrights “promote the Progress of Science and useful arts.” Hence, the “Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one’s expression, copyright supplies the economic incentive to create and disseminate ideas.” Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 558, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); see also Eldred v. Ashcroft, 537 U.S. 186, 219, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (noting that “copyright’s purpose is to promote the creation and publication of free expression”) (emphasis in original). In keeping with copyright’s function, “the justification of the •copyright law is the protection of the com *745 mercial interest of the [ jauthor. It is not to ... protect secrecy, but to stimulate creation by protecting its rewards.” Salinger, 607 F.3d at 81 n. 9 (quoting New Era Publ’ns Int’l, ApS v. Henry Holt & Co., 695 F.Supp. 1493, 1526 (S.D.N.Y.1988)).
As Garcia frames it, “the main issue in this case involves the vicious frenzy against Ms. Garcia that the Film caused among certain radical elements of the Muslim community,” which has caused “severe emotional distress, the destruction of her career and reputation” and credible death threats. With respect to irreparable harm, she argues that “[t]he injuries she seeks to avoid — damage to her reputation, unfair[,] forced promotion of a hateful Film, and death — will be avoided if any injunction issues.”
This relief is not easily achieved under copyright law. Although we do not take lightly threats to life or the emotional turmoil Garcia has endured, her harms are untethered from — and incompatible with— copyright and copyright’s function as the engine of expression.
In broad terms, “the protection of privacy is not a function of the copyright law.... To the contrary, the copyright law offers a limited monopoly to encourage ultimate public access to the creative work of the author.” Bond v. Blum, 317 F.3d 385, 395 (4th Cir.2003); see also Monge v. Maya Magazines, Inc., 688 F.3d 1164, 1177 (9th Cir.2012) (quoting Bond and “pointedly” noting copyright cases are analyzed “only under copyright principles, not privacy law”).
Likewise, authors cannot seek emotional distress damages under the Copyright Act, because such damages are unrelated to the value and marketability of their works. See In re Dawson, 390 F.3d 1139, 1146 n. 3 (9th Cir.2004) (noting that “ ‘actual damages’ in the context of the Copyright Act ... cover only economic damages” (internal citation omitted)); Mackie v. Rieser, 296 F.3d 909, 917 (9th Cir.2002) (rejecting copyright damages where “the infringement did not in any way influence the market value” of a piece of outdoor artwork but instead boiled down to the author’s “personal objections to the manipulation of his artwork”).
By way of example, erstwhile professional wrestler and reality TV star Hulk Hogan wanted to enjoin Gawker.com from posting a sex tape of Hogan with a mistress, claiming copyright infringement. Bollea v. Gawker Media, LLC, 913 F.Supp.2d 1325, 1327 (M.D.Fla.2012). The district court found an absence of irreparable harm because Hogan “produced no evidence demonstrating that he will suffer irreparable harm in the copyright sense absent a preliminary injunction. The only evidence in the record reflecting harm to [Hogan] relates to harm suffered by him personally and harm to his professional image due to the ‘private’ nature of the Video’s content. This evidence does not constitute irreparable harm in the context of copyright infringement.” Id. at 1329; cf. New Era Publ’ns, 695 F.Supp. at 1499 (denying injunction sought “not in good faith for its intended purpose of protecting the value of publication rights, but rather to suppress a derogatory study of the founder of the Church of Scientology”).
Privacy laws, not copyright, may offer remedies tailored to Garcia’s personal and reputational harms. On that point, we offer no substantive view. Ultimately, Garcia would like to have her connection to the film forgotten and stripped from YouTube. Unfortunately for Garcia, such a “right to be forgotten,” although recently affirmed by the Court of Justice for the European Union, is not recognized in the United States. See Case C-131/12, Google *746 Spain SL v. Agenda Española de Protec-ción de Datos (AEPD), ECLI:EU:C:2014:616 (May 13, 2014) (requiring Google to consider individual requests to remove personal information from its search engine); Internet Law— Protection of Personal Data — Court of Justice of the European Union Creates Presumption that Google Must Remove Links to Personal Data Upon Request, 128 Harv. L.Rev. 735 (2014).
Nor is Garcia protected by the benefits found in many European countries, where authors have “moral rights” to control the integrity of their works and to guard against distortion, manipulation, or misappropriation. See Kelley v. Chicago Park Dist., 635 F.3d 290, 296 (7th Cir.2011) (describing differences in moral rights in American copyright law versus other countries). Except for a limited universe of works of visual art, such as paintings and drawings protected under the Visual Artists Rights Act of 1990, United States copyright law generally does not recognize moral rights. 17 U.S.C. § 106A. Motion pictures specifically are excluded from moral rights protection. § 106A; § 101 (“[W]ork of visual art does not include ... any ... motion picture or other audiovisual work. ...”).
In short, Garcia’s harms are too attenuated from the purpose of copyright. We do not foreclose that in a different circumstance with a strong copyright claim, a court could consider collateral consequences as part of its irreparable harm analysis and remedy. 17 U.S.C. § 502 (providing that the court may grant injunctions “as it may deem reasonable to prevent or restrain infringement of a copyright”). But such a case is not before us.
Garcia waited months to seek an injunction after Innocence of Muslims was uploaded to YouTube in July 2012; she did not seek emergency relief when the film first surfaced on the Internet. The district court did not abuse its discretion by finding this delay undercut Garcia’s claim of irreparable harm. See Oakland Tribune, Inc. v. Chronicle Publ’g Co., 762 F.2d 1374, 1377 (9th Cir.1985) (“Plaintiffs long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.”); 4 Nimmer on Copyright § 14.06[A][3][e] (noting unreasonable delay can defeat irreparable injury and the length of time “need not be great”). Garcia notes that she moved swiftly once the film was translated into Arabic and sparked death threats against her. But that proves the point: the gravamen of Garcia’s harm is untethered from her commercial interests as a performer, and instead focuses on the personal pain caused by her association with the film.
The district court did not abuse its dis-. cretion in determining that Garcia failed to muster a clear showing of irreparable harm. See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 999-1000 (9th Cir.2011) (“Harm must be proved, not presumed.” (quoting 4 Nimmer on Copyright § 14.06[A][5])).
In the face of a doubtful copyright claim and the absence of irreparable harm to Garcia’s interests as an author, we need not consider the final two Winter factors, the balance of equities and public interest.
II. The Panel’s Injunction
In February 2014, the panel majority issued the following injunction: “Google, Inc. shall take down all copies of ‘Innocence of Muslims’ from YouTube.com and from any other platforms under Google’s control, and take all reasonable steps to prevent further uploads of ‘Innocence of Muslims’ to those platforms.” Soon after, the panel amended the order to state that the prohibition did “not preclude the posting or display of any version of ‘Innocence *747 of Muslims’ that does not include Cindy Lee Garcia’s performance.”
Although the first order was more sweeping, the second cast the court in the uneasy role of film editor. The amendment only mattered if Google assumed authority to change the content of someone else’s copyrighted film. To no one’s surprise, the end result was the same: the entire film remained removed from YouTube.
The takedown order was unwarranted and incorrect as a matter of law, as we have explained above. It also gave short shrift to the First Amendment values at stake. The mandatory injunction censored and suppressed a politically significant film — based upon a dubious and unprecedented theory of copyright. In so doing, the panel deprived the public of the ability to view firsthand, and judge for themselves, a film at the center of an international uproar.
Although the intersection between copyright and the First Amendment is much-debated,[14] the Supreme Court teaches that copyright is not “categorically immune from challenges under the First Amendment.” Eldred, 537 U.S. at 221, 123 S.Ct. 769 (internal citation omitted). To be sure, this is not a case of garden-variety copyright infringement, such as seeking to restrain the use of copyrighted computer code. The panel’s takedown order of a film of substantial interest to the public is a classic prior restraint of speech. Alexander v. United States, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) (“Temporary restraining orders and permanent injunctions — i.e., court orders that actually forbid speech activities — are classic examples of prior restraints.”). Prior restraints pose the “most serious and the least tolerable infringement on First Amendment rights,” Hunt v. NBC, 872 F.2d 289, 293 (9th Cir.1989) (citation omitted), and Garcia cannot overcome the historical and heavy presumption against such, restraints with a thin copyright claim in a five-second performance.
The amended injunction issued February 28, 2014 is dissolved immediately and has no force or effect.
Conclusion
At this stage of the proceedings, we have no reason to question Garcia’s claims that she was duped by an unscrupulous filmmaker and has suffered greatly from her disastrous association with the Innocence of Muslims film. Nonetheless, the district court did not abuse its discretion when it denied Garcia’s motion for a preliminary injunction under the copyright laws.
AFFIRMED.

. We use the transliteration "Mohammed” because both parties use this spelling. We note that, according to the American Library Association-Library of Congress Arabic Ro-manization Table, available at http://www.loc. gov/catdir/cpso/roman.html, an alternate transliteration is "Muhammad.”

. See YouTube.com Press Statistics, https:// www.youtube.com/yt/press/statistics.html (last visited May 13, 2015).

. In connection with en banc proceedings, we received thirteen amicus briefs from a broad array of interested parties, including copyright and Internet law scholars; content, Internet service, and technology providers; actors; media organizations; and nonprofit groups. The briefs were helpful to our understanding of the implications of this case from various points of view. We thank amici for their participation.

. "The status quo means the last, uncontested status which preceded the pending controversy.” N.D. ex rel. Parents v. Haw. Dep’t of Educ., 600 F.3d 1104, 1112 n. 6 (9th Cir.2010) (internal citation and quotation marks omitted). The status quo preceding this litigation was that Innocence of Muslims was uploaded to and available for viewing on YouTube. The preliminary injunction issued by the panel majority disrupted that status quo by ordering Google to remove the film.

.Down the road, Garcia also may have a contract claim. She recalls signing some kind of document, though she cannot find a copy. We take no position on this claim. Nor do we consider whether Garcia’s performance was a work made for hire. See 17 U.S.C. § 101 (defining "work made for hire" as work "prepared by an employee within the scope of his or her employment" or, where both parties sign a written agreement, a work “specially ordered or commissioned ... as a part of a motion picture see also § 201(b) (in case of work made for hire, the employer or person for whom the work is prepared is the author, subject to express agreement otherwise). In district court proceedings, the parties disputed whether Garcia signed a work-made-for-hire agreement, and the issue is not before us on appeal.

. In another odd twist, one of Garcia’s primary objections rests on the words falsely attributed to her via dubbing. But she cannot claim copyright in words she neither authored nor spoke. That leaves Garcia with a legitimate and serious beef, though not one that can be vindicated under the rubric of copyright.

. As Nimmer notes, when "the question as to copyrightabilty forms the core of the dispute between the parties, ... input from the Copyright Office — the governmental agency that possesses special expertise in determining the bounds of copyright protection — [can] be of great value.” 2 Nimmer on Copyright § 7.16[B][3][b][vi].

.The dissent's suggestion that this case is somehow governed by the Beijing Treaty on Audiovisual Performances is misplaced. See Dissent at 38-39. At present, the treaty is aspirational at best. It has yet to take effect because only six countries have ratified or acceded to the treaty — well short of the thirty it needs to enter into force. See World Intellectual Property Organization, Summary of the Beijing Treaty on Audiovisual Peiformances (2012), available at www.wipo.int/ treaties/en/ip/beijmg/summary_beijing.html (last visited May 13, 2015). Although the United States signed the treaty in 2012, it has not been ratified by the U.S. Senate. Article II, Section 2 of the Constitution requires the concurrence of a two-thirds majority of that body. The dissent’s reference to the fact sheet from the Patent and Trademark Office, which unlike the Copyright Office lacks legal authority to interpret and administer the Copyright Act, is similarly inapposite. See Dissent at 751.

. Although the ultimate issue in Aalmu-hammed pertained to joint authorship, the definition of "work” was essential, just as in our case, to the analysis. 202 F.3d at 1233-34; see also Richlin v. Metro-Goldwyn-Mayer Pictures, Inc., 531 F.3d 962, 968 (9th Cir.2008) (relying on Aalmuhammed in reasoning that to determine authorship, the court must first determine the “work” to be examined).

. The term "cast of thousands” originated as a Hollywood "[ajdvertising come-on referring to the crowds of background players in a spectacular epic film.” Blumenfeld’s Dictionary of Acting and Show Business 48 (Hal Leonard Corp. 2009).

. For information on Ben-Hur, see Ben-Hur, IMDb, http://www.imdb.com/title/tt0052618/ (last visited Jan. 21, 2015), and Ben-Hur: A Tale of the Christ, Trivia, IMDb, http://www. imdb.com/title/ ttOO 16641/trivia (last visited *743 jan. 30, 2015). For information on Lord of the Rings, see Lord of the Rings: The Fellowship of the Ring, IMDb, http://www.imdb.com/ title/tt0120737/ (last visited Jan. 21, 2015), and Lord of the Rings: The Fellowship of the Ring, Trivia,' IMDb, http://www.imdb.com/ title/tt0120737/trivia (last visited Jan. 30, 2015).

. Any copyright claim aside, the district court found that Garcia granted Youssef a non-exclusive implied license to use her performance in the film. Although Garcia asked Youssef about Desert Warrior’s content, she in no way conditioned the use of her performance on Youssef's representations. On this record, we cannot disturb the district court's finding as clearly erroneous. Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1122-23 (9th Cir.2014) (noting that factual findings reviewed for clear error).

. The Copyright Office draws a distinction between acting performances like Garcia’s, which are intended to be an inseparable part of an integrated film, and standalone works that are separately fixed and incorporated into a film. We in no way foreclose copyright protection for the latter — any “discrete work in itself that is later incorporated into a motion picture,’’ as the Copyright Office put it. See Effects Assocs., 908 F.2d at 558-59 (recognizing independent copyrightability of special effects footage incorporated into film).

. See, e.g., Joseph P. Bauer, Copyright and the First Amendment: Comrades, Combatants, or Uneasy Allies?, 67 Wash. & Lee L.Rev. 831 (2010); Mark A. Lemley & Eugene Volokh, Freedom of Speech and Injunctions in Intellectual Property Cases, 48 Duke L.J. 147 (1998).