*16 Casa Duse, LLC v. Alex Merkin & Maurice A. Reichman*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: September 3, 2014  Decided: June 29, 2015)

Docket No. 13-3865

—————————————————

16 Casa Duse, LLC,
Plaintiff-Counter-Defendant-Appellee,

v.

Alex Merkin,
Defendant-Counter-Claimant-Appellant,
Maurice A. Reichman, Esq.,
Appellant,
A. Merkin Entertainment, LLC,
Defendant.[*]

—————————————————

Before:     KATZMANN, *Chief Judge*, SACK and LYNCH, *Circuit Judges*.

The defendant appeals from a September 27, 2013, judgment of the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) granting summary judgment to the plaintiff on its copyright and state-law claims related to a film entitled *Heads Up*, dismissing the defendant's counterclaims, and awarding the plaintiff costs and attorney's fees. Because we agree that the plaintiff owns the relevant copyright interests, we conclude that the district court properly granted summary judgment to the plaintiff on its

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

copyright claims and properly enjoined the defendant from interfering with the plaintiff's use of the work in question. We conclude, though, that the defendant, not the plaintiff, was entitled to summary judgment on the plaintiff's claim for tortious interference with business relations under New York law. The judgment of the district court is therefore:

AFFIRMED in part, REVERSED in part, and REMANDED.

ELEANOR M. LACKMAN (Joshua S. Wolkoff, *on the brief*), Cowan, DeBaets, Abrahams & Sheppard LLP, New York, NY *for Plaintiff–Counter-Defendant-Appellee.*

MAURICE A. REICHMAN, New York, NY, *for Defendant-Counter-Claimant-Appellant & Appellant.*

SACK, *Circuit Judge*:

This is an appeal from a judgment of the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) granting summary judgment to the plaintiff on its copyright and state-law claims, dismissing the defendant's copyright counterclaims, and awarding the plaintiff costs and attorney's fees. Because we agree with the district court that the plaintiff owns the copyright to all versions of the work in question, a film entitled *Heads Up*, and that copyright does not subsist in individual contributions to that film, we

conclude that the district court properly granted summary judgment to the plaintiff on its copyright claims and did not abuse its discretion in enjoining the defendant from interfering with the plaintiff's use of the film. We also conclude, however, that the defendant, not the plaintiff, was entitled to summary judgment on the plaintiff's claim for tortious interference with business relations under New York law. We therefore affirm in part, reverse in part, and remand the case to the district court with instructions for it to grant the defendant's motion for summary judgment on the tortious interference claim and for such further proceedings as are warranted.

## BACKGROUND

Appellee 16 Casa Duse, LLC, ("Casa Duse") is a film-production company based in Brooklyn, New York. The company is owned and operated by Robert Krakovski. Appellant Alex Merkin is a film director, producer, and editor. Appellant Maurice Reichman is an attorney who represented Merkin in some of his dealings with Casa Duse.

In September 2010, Krakovski, acting at all relevant times as the principal of Casa Duse, purchased the rights to a screenplay entitled *Heads Up* from the work's author, Ben Carlin. Krakovski, who planned to finance and produce a

short film based on the screenplay, asked Merkin whether he would be willing to direct the film. Merkin agreed, and the two settled informally on a fee of $1,500 for Merkin's services.

In the ensuing months, Krakovski assembled a cast and crew for the film, also entitled *Heads Up*. He hired additional producers, a script supervisor, a photography director, camera operators, various designers and technicians, and actors, creating an ensemble of about thirty members. Although Merkin recommended that Krakovski employ some persons as crew members, Krakovski made the ultimate hiring decisions. In the meantime, Krakovski, Merkin, and others involved with the project planned various aspects of the production, including props, locations, and scheduling.

Each cast and crew member other than Merkin entered into an "Independent Contractor [] Agreement" with Casa Duse. The agreements contained statements that Casa Duse would "engage the services [of the cast or crew member] as 'work for hire' of an independent contractor," J.A. 485, and set out terms for compensation, performance standards, and other matters. The work-for-hire agreements also stated that Casa Duse would retain "complete control" of the film's production and "own all of the results and proceeds of [the

cast and crew's] services in connection with the [film] . . . including, but not limited to, all rights throughout the world of . . . copyright . . . ." J.A. 487.

In February 2011, Krakovski sent Merkin a draft work-for-hire agreement entitled "Director Employment Agreement." Its terms were similar to those in the agreements signed by other cast and crew. It provided, *inter alia*, that Casa Duse would own all rights in the film. Merkin acknowledged his receipt of the draft by e-mail, noting that he would ask his lawyer to review it.

Some two-and-a-half months later, on May 9, 2011, Krakovski sent Merkin an e-mail reminding him to execute the agreement. Merkin did not respond.

Krakovski contacted Merkin again on May 16, a week before production was scheduled to start, reminding him again of the importance of completing the agreement before work on the film began. Merkin again failed to reply. On May 18, Krakovski e-mailed again asking for a completed agreement, to no avail.

Despite the lack of a completed agreement, production began later that month. During production, which included three days of filming, Merkin performed his role as director by advising and instructing the film's cast and crew on matters ranging from camera angles and lighting to wardrobe and

makeup to the actors' dialogue and movement. Merkin completed his direction of the film by the end of May.

In June 2011, Krakovski gave Merkin a hard drive containing the raw film footage in the hope that Merkin would be able to edit the footage. In the absence of a work-for-hire agreement, the parties entered into a "Media Agreement" under which Merkin would edit but not license, sell, or copy the footage for any purpose without the permission of Casa Duse.

On June 16, Krakovski sent an e-mail to Merkin proposing changes to the Media Agreement in order to "clarify," first, that Casa Duse and not Merkin owned the footage and hard drive, and, second, that Casa Duse's entry into the Media Agreement had not relinquished "any directorial/editorial terms [or] rights" that would be finally allocated by a work-for-hire agreement. J.A. 580. Merkin replied, saying that the proposed changes seemed acceptable but also "clarify[ing]," for his part, that he was "not giving up any creative or artistic rights" he had in the project and "all of [his] creative work . . . is still [his] work and not the property of 16 Casa Duse, LLC." J.A. 581. Krakovski responded, asserting that he had never intended the film to be "a 'Joint Venture'" and instead

had intended to obtain Merkin's services pursuant to a work-for-hire agreement. J.A. 521.

From July to October 2011, Krakovski and Merkin continued to negotiate the terms of the Media Agreement and a work-for-hire agreement. The parties communicated directly—via e-mail—and through their attorneys. From time to time, they appeared to reach agreement on some key terms, including Casa Duse's ownership of the film, Merkin's authority to make a "director's cut," and Merkin's ability to remove his name from the final product if he so desired, but negotiations ultimately collapsed. Krakovski demanded the return of the hard drive containing the raw film footage. Merkin refused and warned Krakovski that, without an agreement in place, Casa Duse could not, in his view, release the film.

In November 2011, Merkin sent Krakovski a letter "putting [Krakovski] on notice that [Merkin] forb[ade] any use whatsoever of the raw footage." J.A. 400. The letter conceded that Krakovski owned the screenplay but insisted that Merkin owned the "raw footage." *Id.* In December 2011, Krakovski responded through counsel, who, by e-mail, proposed that Casa Duse pay Merkin the agreed-upon $1,500 for his directorial services, allow him to complete his desired

"director's cut," and ensure his opportunity to remove his name from the finished product if he wished. In exchange, Merkin would agree to deem his directorial services a "work for hire" for Casa Duse. The e-mail also advised that Casa Duse had, by then, retained a different editor. Merkin responded and reiterated his position that Casa Duse was "not permitted to use [his] work in any edit without [his] involvement." J.A. 403. Merkin threatened to contact film festivals to inform them that Casa Duse lacked rights to the film in the event Krakovski did not assent. Krakovski's attorney responded by sending an e-mail to Merkin's attorney, disputing Merkin's position and warning that any interference with screening of the film would potentially subject Merkin to liability.

In January 2012, as the dispute continued to simmer, Merkin registered a copyright in the film with the United States Copyright Office. The title of the registration was "Raw footage for film 'Heads Up' Disks 1-4," reflecting the fact that Merkin had copied the footage from the hard drive onto four DVDs. J.A. 71. The registration listed the type of work as "Motion Picture" and asserted that Merkin was its sole author. Merkin did not obtain Casa Duse's permission to register the copyright, and Krakovski was unaware of the registration.

In March 2012, Krakovski began submitting *Heads Up* to film festivals and making plans to publicize the film. To that end, he scheduled an invitation-only screening for approximately seventy persons at the New York Film Academy ("NYFA") on April 18, 2012. Krakovski also organized a reception to follow at a nearby restaurant, City Crab, for which he paid a non-refundable deposit of $1,956.58.

On the date of the event, the NYFA chairperson contacted Krakovski to tell him that Merkin's attorney (Reichman) had threatened the NYFA with a cease-and-desist order to prevent the screening from proceeding. According to Reichman, it was Merkin—not Reichman—who contacted the NYFA and mentioned a cease and desist "notice," not an order, at which point the NYFA contacted Reichman. In any event, the NYFA cancelled the screening in response to these threats, and Casa Duse lost its restaurant deposit. Casa Duse subsequently missed at least four film festival submission deadlines as a result of the dispute. Merkin did not return the hard drive, the DVDs, or the raw footage in any form.

Casa Duse brought suit against Merkin and his limited liability company, A. Merkin Entertainment, LLC, ("AME") in May 2012 seeking, *inter alia*, a

temporary restraining order and injunction enjoining Merkin from interfering with its use of the film. The district court granted the temporary restraining order and issued an order to show cause why a preliminary injunction should not issue. After briefing, on May 18, 2012, the court issued the preliminary injunction that Casa Duse sought.

Some two months later, in July 2012, Casa Duse filed an amended complaint requesting a judgment declaring that (1) Casa Duse was not liable to Merkin or AME for copyright infringement; (2) Neither Merkin nor AME owned a copyright interest in the film; and (3) Merkin's copyright registration was invalid. Casa Duse also asserted claims for breach of contract, tortious interference with business relations, and conversion. It sought relief in the form of compensatory damages; an order requiring Merkin to withdraw his copyright registration, return all forms of the footage, and refrain from interfering with Casa Duse's use of the film; and costs and attorney's fees as a sanction under 28 U.S.C. § 1927 and pursuant to the Copyright Act's fees provision, 17 U.S.C. § 505.

The defendants filed an Amended Answer and counterclaims in August 2012, requesting a judgment declaring that (1) "A Motion Picture Director Is An Author," (2) "17 U.S.C. Has No Provision Of, Or For, A 'Merged Work,'" (3)

"There Can Be No Work For Hire Or Assignment Without An Express Writing," (4) Merkin's copyright registration was valid, (5) attorney's fees pursuant to 17 U.S.C. § 505 were unavailable in the absence of a copyright infringement claim, and (6) it was "improper" for Casa Duse's complaint to include a request for sanctions pursuant to 28 U.S.C. § 1927. J.A. 318-23. Merkin also asserted a claim for breach of contract based on Casa Duse's failure to pay him for his services.

Casa Duse moved for summary judgment on its claims and its requests for fees and sanctions. Merkin cross-moved for summary judgment on all of his claims and most of Casa Duse's claims, including its claim for tortious interference with business relations. Merkin also requested that the court vacate the preliminary injunction and strike the fees and sanctions request. AME moved to dismiss the complaint as to AME in its entirety.

The district court declined to vacate the injunction. It granted summary judgment to Casa Duse on all claims, along with fees against Merkin and sanctions against Reichman. *16 Casa Duse, LLC v. Merkin*, No. 12 CIV. 3492 RJS, 2013 WL 5510770, at \*20-21, 2013 U.S. Dist. LEXIS 143958, at \*63-64 (S.D.N.Y. Sept. 27, 2013). The court granted AME's motion to dismiss. *Id.*, 2013 WL

5510770, at *20, 2013 U.S. Dist. LEXIS 143958, at *64.[1]  The court also dismissed all of Merkin's counterclaims except for his claim for breach of contract.  *Id.*  The court subsequently granted Merkin's motion, agreed to by Casa Duse, to voluntarily dismiss his breach of contract claim without prejudice.  After accepting additional submissions from the parties as to the proper amount of costs and fees, the court entered its final judgment on December 19, 2013, awarding Casa Duse (1) $1,956.58 in damages resulting from Merkin's interference with the screening event; and (2) $185,579.65 in attorney's fees and costs, of which Merkin and Reichman would be jointly and severally liable for $175,634 and Reichman would be solely liable for the remaining $9,945.65.

Merkin and Reichman appealed.

---

[1] Casa Duse does not challenge this dismissal.

**DISCUSSION**

This case requires us to answer a question of first impression in this Circuit: May a contributor to a creative work whose contributions are inseparable from, and integrated into, the work maintain a copyright interest in his or her contributions alone? We conclude that, at least on the facts of the present case, he or she may not.

I.   Standard of Review

"We review a district court's grant of summary judgment de novo." *Blanch v. Koons*, 467 F.3d 244, 249 (2d Cir. 2006). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Id.* at 250 (alteration in original) (quoting Fed. R. Civ. P. 56).

"We review the District Court's entry of a permanent injunction for abuse of discretion, which may be found where the Court, in issuing the injunction, relied on clearly erroneous findings of fact or an error of law." *Knox v. Salinas*, 193 F.3d 123, 128-29 (2d Cir. 1999) (per curiam).

We review a district court's award of costs and attorney's fees under 17 U.S.C. § 505 and its imposition of sanctions under 28 U.S.C. § 1927 for abuse of

discretion. *See Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 117 (2d Cir. 2002) (17 U.S.C. § 505); *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000) (28 U.S.C. § 1927).

## II. Jurisdiction

We must determine, as a threshold matter, whether we have the authority to hear the merits of this case on appeal. We generally lack jurisdiction, under 28 U.S.C. § 1291,[2] over appeals from nonfinal orders of the district courts. This "final judgment rule" promotes judicial economy by "forbidding piecemeal disposition on appeal of what for practical purposes is a single controversy." *Cobbledick v. United States*, 309 U.S. 323, 325 (1940). Accordingly, "immediate appeal is unavailable to a plaintiff who seeks review of an adverse decision on some of its claims by voluntarily dismissing the others *without prejudice*." *Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 425 F.3d 207, 210 (2d Cir. 2005) (emphasis in original). Were the rule otherwise, such a plaintiff would "effectively have secured an otherwise unavailable interlocutory appeal." *Id.* (quoting *Chappelle v. Beacon Commc'ns Corp.*, 84 F.3d 652, 654 (2d Cir. 1996)).

---

[2] Section 1291 provides in pertinent part: "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."

In the case before us, the district court entered judgment after dismissing Merkin's breach of contract claim *without prejudice* at the parties' request. The court's judgment would thus ordinarily be nonfinal, depriving us of jurisdiction over the merits.

At argument before us, however, Merkin agreed to a dismissal of his remaining claim, for breach of contract, with prejudice. "A party who loses on a dispositive issue that affects only a portion of his claims may elect to abandon the unaffected claims, invite a final judgment, and thereby secure review of the adverse ruling." *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 246 (2d Cir. 1987). We may therefore treat the district court's order as final. *See Rabbi Jacob Joseph Sch.*, 425 F.3d at 211 (refusing to treat order as final when "the [plaintiff] expressly declined to abandon [its] claim with prejudice" at oral argument); *see also JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 776-77 (7th Cir. 1999) ("[A]t argument, the plaintiff's lawyer quickly agreed that we could treat the dismissal of the two claims [which the district court had dismissed without prejudice] as having been with prejudice, thus winding up the litigation and eliminating the bar to our jurisdiction."). We therefore proceed to the merits.

III.    Copyright Claims

Merkin argues that the district court erred in concluding, first, that Merkin could not copyright his creative contributions to the film, and, second, that he lacks copyright ownership of the "raw film footage."  Casa Duse responds that individual contributions to a film, such as direction, are not themselves subject to copyright protection and that Casa Duse retains sole copyright ownership of the film and the "raw footage," to the extent the two are distinguishable for copyright purposes.

Two points merit mention at the outset.

First, the parties agree that Merkin is not a "joint author" or "co-author" of the film under the 1976 Copyright Act.  *See* 17 U.S.C. § 101 ("A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.").  If he were, that fact would likely prohibit his interference with Casa Duse's use and display of the film, because "[o]ne joint owner cannot be liable for copyright infringement to another joint owner."  1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.10[A] (2015).  A co-authorship claimant in our Circuit generally must show that "each of the putative co-authors (1) made

independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998) (citing *Childress v. Taylor*, 945 F.2d 500, 507-08 (2d Cir. 1991)).  Even assuming the first prong[3] is met here, we agree with the district court that "the record uniformly establishes that [Casa Duse], through its principal, Krakovski, never intended to share authorship of the film with Merkin or anyone else," and "[t]here is also considerable evidence that Merkin never intended to be [Casa Duse's] co-author." *16 Casa Duse, LLC*, 2013 WL 5510770, at *8-9, 2013 U.S. Dist. LEXIS 143958, at *23-25.[4]

Second, the parties also agree that Merkin's efforts cannot be deemed a "work made for hire."  *See* 17 U.S.C. § 201(b) ("[T]he . . . person for whom the work[-for-hire] was prepared is considered the author . . . and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns

---

[3] It seems likely that "[b]y 'copyrightable' [the *Childress* court] meant only to say that the coauthor's contribution must be the product of authorship, i.e., expression.  [The court] did not mean that in order to be a coauthor one must be able to obtain a copyright on his or her separate contribution," 2 *Patry on Copyright* § 5:15, or even that such would be possible.

[4] We noted in *Thomson* that "the test of co-authorship intent will vary depending on the specific factual circumstances."  *Thomson*, 147 F.3d at 201 n.16.  We need not determine the ways in which the test might vary in the circumstances presented by this case, because the parties disclaim joint authorship.

all of the rights comprised in the copyright.").  A work-for-hire arrangement

requires:

> (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture[, or for other specified purposes] . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

*Id.* § 101.  Merkin was not Casa Duse's employee, *see Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740-41 (1989) ("[T]he term 'employee' [in section 101] should be understood in light of the general common law of agency."), and the parties failed to execute a written agreement.

*A.     Copyright in Creative Contributions to a Work*

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102(a).  We have never decided whether an individual's non-*de minimis* creative contributions to a work in which copyright protection subsists, such as a film, fall within the subject matter of copyright, when the contributions are inseparable from the work and the individual is neither the sole nor a joint author of the work and is not a party

to a work-for-hire arrangement. *See Thomson*, 147 F.3d at 206 (acknowledging open question and resolving case on alternative grounds). We answer that question in the negative on the facts of the present case, finding that the Copyright Act's terms, structure, and history support the conclusion that Merkin's contributions to the film do not themselves constitute a "work of authorship" amenable to copyright protection.

The Copyright Act does not define the term "works of authorship." Section 102 of the Act, however, lists examples of categories of "works of authorship," including "literary works," 17 U.S.C. § 102(a)(1), "musical works," *id.* § 102(a)(2), and—most relevant here—"motion pictures and other audiovisual works," *id.* § 102(a)(6). This list is not exhaustive, but as we have previously observed, categories of creative efforts that are not "similar []or analogous to any of the listed categories" are unlikely to fall within the subject matter of federal copyright protection. *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 846 (2d Cir. 1997) (concluding that "basketball games do not fall within the subject matter of federal copyright protection because they do not constitute 'original works of authorship' under 17 U.S.C. § 102(a)."). Motion pictures, like "pantomimes," 17 U.S.C. § 102(a)(4), and "dramatic works," *id.* § 102(a)(3), are works that may be

expected to contain contributions from multiple individuals. *See Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 975 (9th Cir. 2008) ("A motion picture is a work to which many contribute; however, those contributions ultimately merge to create a unitary whole."). But the Act lists none of the constituent parts of any of these kinds of works as "works of authorship." This uniform absence of explicit protection suggests that non-freestanding contributions to works of authorship are not ordinarily themselves works of authorship.

Other provisions of the Act support this conclusion. The Act's definition of "joint work," a work prepared by multiple authors "with the intention that their *contributions* be merged into inseparable or interdependent parts of a unitary whole," 17 U.S.C. § 101 (emphasis added), suggests that such inseparable contributions are not themselves "works of authorship." Copyright may subsist in contributions to a collective work, *see id.* § 201(c) ("Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole."), but only when such contributions constitute "separate and independent" works. *Id.* § 101 ("A 'collective work' is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting *separate and independent works* in themselves, are assembled into a

collective whole." (emphasis added)). The requirement that contributions be

"separate and independent" in order to obtain their own copyright protection

also indicates that inseparable contributions integrated into a single work cannot

separately obtain such protection.

The legislative history of the Copyright Act further supports this reading.

According to the House Report on the 1976 Act:

> [A] motion picture would normally be a joint rather than a collective
> work with respect to those authors who actually work on the film,
> although their usual status as employees for hire would keep the
> question of coownership from coming up. On the other hand,
> although a novelist, playwright, or songwriter may write a work
> with the hope or expectation that it will be used in a motion picture,
> this is clearly a case of separate or independent authorship rather
> than one where the basic intention behind the writing of the work
> was for motion picture use.

H.R. Rep. No. 94-1476, at 120 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736.

While issues of "coownership" of a copyright may arise in the motion picture

context, the question of separate contributions meriting separate copyrights as

"works" ordinarily would not, unless the motion picture incorporates separate,

freestanding pieces that independently constitute "works of authorship." In a

joint work, "the separate elements [comprising the work] merge into a unified

whole," whereas in a collective work, individuals' contributions "remain

unintegrated and disparate." *Id.*, H.R. Rep. No. 94-1476, at 122, 1976 U.S.C.C.A.N., at 5738.

As Casa Duse observes, the Copyright Office has, in an unrelated case, suggested a similar interpretation of the Act. The Office has stated that an individual who lacks a work-for-hire agreement but who "intend[s] her contribution or performance to 'be merged into inseparable or interdependent parts of a unitary whole[,]' 17 U.S.C. § 101[,] . . . may assert a claim in joint authorship in the motion picture, but not sole authorship of her performance in a portion of the work." Letter from Robert J. Kasunic, Assoc. Register of Copyrights and Dir. of Registration Policy and Practices, U.S. Copyright Office, to M. Cris Armenta, The Armenta Law Firm (Mar. 6, 2014) (attached as appendix to Brief in Response to Suggestion of Rehearing En Banc [Dkt. 54] at ADD47, *Garcia v. Google*, No. 12-57302 (9th Cir. Mar. 12, 2014)). We need not defer to the Copyright Office's interpretation as a general matter, *see Carol Barnhart Inc. v. Econ. Cover Corp.*, 773 F.2d 411, 414 (2d Cir. 1985), or under the factually distinct circumstances of the present case. We find its analysis persuasive nonetheless.

There was, until recently, some authority apparently to the contrary. The majority of a three-judge panel of the Ninth Circuit concluded that copyright

22

protection may subsist in an actor's performance in a motion picture. *See Garcia v. Google, Inc.*, 766 F.3d 929, 933-36 (9th Cir.), *rev'd en banc*, --- F.3d ---, No. 12-57302, 2015 WL 2343586, 2015 U.S. App. LEXIS 8105 (9th Cir. May 18, 2015) ("*Garcia (en banc)*"). In *Garcia*, as in the present case, an individual who made a contribution to a finished film—in that case, an actor—claimed ownership of a copyright interest in her contribution. The court reasoned that the actor's performance exhibited at least a "minimal degree of creativity" such that the actor had probably engaged in an original act of authorship. *Id.* at 934 (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)). And the performance was, in the court's view, "fixed" in a tangible medium as part of the finished film. *Id.*

An *en banc* panel reversed, however, adhering to the Copyright Office's view and, based thereon, concluding that the actor's "theory of copyright law would result in [a] legal morass[,] . . . [making] Swiss cheese of copyrights." *Garcia (en banc)*, --- F.3d at ---, 2015 WL 2343586, at *6, 2015 U.S. App. LEXIS 8105, at *23 (internal quotation marks omitted). We agree. Filmmaking is a collaborative process typically involving artistic contributions from large numbers of people, including—in addition to producers, directors, and

23

screenwriters—actors, designers, cinematographers, camera operators, and a host of skilled technical contributors. If copyright subsisted separately in each of their contributions to the completed film, the copyright in the film itself, which is recognized by statute as a work of authorship, could be undermined by any number of individual claims. These various contributors may make original artistic expressions, which are arguably fixed in the medium of film footage. But while originality and fixation are necessary prerequisites to obtaining copyright protection, *see* 17 U.S.C. § 102(a), they are not alone sufficient: Authors are not entitled to copyright protection except for the "works of authorship" they create and fix. *See id.*; *see also Garcia*, 766 F.3d at 941 (N.R. Smith, J., dissenting).

Our conclusion in the present case does not suggest that motion picture directors such as Merkin may never achieve copyright protection for their creative efforts. The director of a film may, of course, be the sole or joint author of that film, such that she or he can secure copyright protection for the work. *See Cmty. for Creative Non-Violence*, 490 U.S. at 737 ("As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."); *see also* F. Jay Dougherty, *Not A Spike Lee Joint? Issues in the Authorship of Motion Pictures*

*Under U.S. Copyright Law,* 49 UCLA L. Rev. 225, 312 (2001) ("[T]he director of the film is certainly potentially one of its most important authors."). And authors of freestanding works that are incorporated into a film, such as dance performances or songs, may copyright these "separate and independent work[s]." 17 U.S.C. § 101 (defining "collective work"). But a director's contribution to an integrated "work of authorship" such as a film is not *itself* a "work of authorship" subject to its own copyright protection.

A final observation: A conclusion other than the one we adopt would grant contributors like Merkin greater rights than joint authors, who, as we have noted, have no right to interfere with a co-author's use of the copyrighted work. *See Childress*, 945 F.2d at 508 ("Joint authorship entitles the co-authors to equal undivided interests in the work."). We doubt that Congress intended for contributors who are not joint authors to have greater rights enabling them to hamstring authors' use of copyrighted works, as apparently occurred in the case at bar. We agree with the *en banc* Ninth Circuit, then, that the creation of "thousands of standalone copyrights" in a given work was likely not intended. *Garcia (en banc)*, --- F.3d at ---, 2015 WL 2343586, at *7, 2015 U.S. App. LEXIS 8105, at *26.

We conclude that Merkin did not obtain and does not possess a copyright in his directorial contributions to the finished film.[5]

*B.    Copyright in Raw Film Footage*

Merkin also contends that he and not Casa Duse owns all copyright interests in the "raw film footage" which was contained on the hard drive and DVDs and from which the final film *Heads Up* was or will be produced.

Unlike Merkin's creative contributions to the film, the film footage is subject to copyright protection.  An original motion picture is surely a "work of authorship" in which copyright protection "subsists" under the Copyright Act.

---

[5] We thus need not reach Casa Duse's alternative contention, which the district court did not address, that even if Merkin maintained some copyright interest in his contributions, he granted Casa Duse an implied license to use those contributions.  *See Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement.").

We note, however, that while one commentator has suggested that "[t]he correct approach to resolving the situation where an individual . . . contributes expression to a work but is found not to be a joint author is to find an implied license," 2 *Patry on Copyright* § 5:17, there are at least some circumstances in which the implied license approach may not permanently resolve the dispute.  "[U]nder federal and state law a material breach of a licensing agreement gives rise to a right of rescission which allows the nonbreaching party to terminate the agreement." *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993), *as amended*, Mar. 24, 1993.  If, for example, Casa Duse had materially breached any implied licensing agreement it had with Merkin (by, for example, failing to pay him), Merkin's subsequent refusal to "giv[e] up any creative or artistic rights" he held, J.A. 581, may have constituted justifiable rescission of the license.

*See* 17 U.S.C. § 102(a)(6).  And "where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time."  *Id.* § 101.  The unedited film footage at issue in this case seems to us to be an early version of the finished product, constituting the film "as of that time."  Because "the Copyright Act [] affords protection to each work at the moment of its creation," *Weissmann v. Freeman*, 868 F.2d 1313, 1317 (2d Cir. 1989), copyright subsists even in such an unfinished work.[6]

With respect to the ownership of any such copyright, "[c]opyright in a work protected under this title vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  The Copyright Act contemplates instances in which multiple authors of a single work may maintain some form of copyright ownership in that work, but the parties agree that *Heads Up* fits into none of those categories.[7]  In cases in which none of the multiple-author scenarios specifically identified by the Copyright Act applies, but multiple individuals lay

---

[6] For this reason, we do not share the concern of the dissenting judge in *Garcia* (*en banc*) that "[i]f Garcia's scene is not a work, then every take of every scene of, say, *Lord of the Rings* is not a work, and thus not protected by copyright, unless and until the clips become part of the final movie." *Garcia* (*en banc*), --- F.3d at ---, 2015 WL 2343586, at *13, 2015 U.S. App. LEXIS 8105, at *43 (Kozinski, J., dissenting).  Copyright subsists in a single work at any stage of its creation, even at points at which the work is not yet complete.

[7] The parties agree, for example, that they are not joint authors.  *See* 17 U.S.C. § 201(a).

claim to the copyright in a single work, the dispositive inquiry is which of the putative authors is the "dominant author." *See Childress*, 945 F.2d at 508.

The district court concluded, and we agree, that Casa Duse was that "dominant author." *See 16 Casa Duse*, 2013 WL 5510770 at *10, 2013 U.S. Dist. LEXIS 143958 at *29. Our Circuit has not proffered rules for determining which of multiple authors is "dominant." *See Childress*, 945 F.2d at 508 (discussing joint authorship inquiry "where one person [] is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another [] are joint authors"). We have, however, identified "factual indicia of ownership and authorship" relevant to the joint-author inquiry. *Thomson*, 147 F.3d at 202. These factors—including decisionmaking authority, billing, and written agreements with third parties, *see id.* at 202-04—are also relevant to our dominant-author inquiry.

As to decisionmaking authority, which refers to the parties' relative control "over what changes are made and what is included in a work," *id.* at 202, the parties agree that Merkin exercised a significant degree of control over many of the creative decisions underlying both the raw film footage and the finished product. As director, Merkin made a variety of creative decisions related to

camera work, lighting, blocking, and actors' wardrobe, makeup, and dialogue delivery, particularly during the three days of filming. But in the context of the project as a whole, Casa Duse exercised far more decisionmaking authority. *Cf. id.* at 198 n.10 (putative co-author's claim to have "developed [a play's] plot and theme, contributed extensively to the story, created many character elements, [and written] a significant portion of the dialogue and song lyrics" did not render her a joint, let alone dominant, author of play). Casa Duse initiated the project; acquired the rights to the screenplay; selected the cast, crew and director; controlled the production schedule; and coordinated (or attempted to coordinate) the film's publicity and release. *Cf. Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000) ("[A]n author superintend[s] the work by exercising control. This will likely be . . . the inventive or master mind who creates, or gives effect to the idea." (second alteration in original) (footnotes and internal quotation marks omitted)).

The second factor is "the way in which the parties bill or credit themselves," which provides evidence of intent of authorship. *Thomson*, 147 F.3d at 203. Although Merkin evidently sought to retain the right to remove his name from the finished film, both parties initially intended to take some credit for the

final product.  The billing inquiry as to the raw footage, then, appears to us to be essentially neutral, as we understand will often be the case in the context of a motion picture.  *See* Dougherty, *supra* at 264 (explaining that this factor "is less helpful in evidencing the contributors' intent for works such as motion pictures").

The third factor, "the parties' agreements with outsiders," *Thomson*, 147 F.3d at 204, points decisively in Casa Duse's favor.  Casa Duse obtained written work-for-hire agreements from every cast and crew member other than Merkin.  Merkin did not, so far as the record shows, enter into any third party agreements.  Indeed, nothing in the record suggests he had any intention to do so.  Casa Duse also entered into an agreement with the screenwriter, authorizing the very creation of the film as a derivative work.  *See* 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works . . . .").  Thus Casa Duse executed *all* of the relevant third-party agreements.

We agree with the district court that in this case, Casa Duse was the dominant author of the film.  The record does not reflect any developments that occurred between the creation of the raw film footage and Casa Duse's attempts to create a finished product that would alter this analysis as to the raw footage.

We thus conclude that Casa Duse, not Merkin, owns the copyright in the finished film and its prior versions, including the disputed "raw film footage."

IV. Tortious Interference with Business Relations

Merkin does not challenge the district court's grant of summary judgment to Casa Duse on two of its three state law claims.[8] He argues, however, that the court erred in granting summary judgment to Casa Duse on its claim for tortious interference with business relations. The court concluded that Merkin's interference with Casa Duse's planned screening and post-screening reception, which resulted in the cancellation of the events and the loss of Casa Duse's restaurant deposit, constituted tortious interference under New York law. We disagree and conclude that the undisputed material facts require judgment as a matter of law in Merkin's favor. *See* Fed. R. Civ. P. 56(a).

To prevail on a claim for tortious interference with business relations—also known as tortious interference with prospective economic advantage, *see Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) —under

---

[8] The district court concluded that Casa Duse's claims for breach of contract and conversion, both of which related to Casa Duse's request that Merkin return the hard drive containing the raw film footage, were properly analyzed as a single claim for replevin under New York law. *16 Casa Duse*, 2013 WL 5510770 at *12, 2013 U.S. Dist. LEXIS 143958 at *35. Merkin does not challenge the district court's order requiring that he return the hard drive and DVDs to Casa Duse.

New York law, a plaintiff must show that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Id.*

Merkin does not contest that to the extent Casa Duse had business relationships with the NYFA and City Crab Restaurant, his actions interfered with those relationships in a way that injured Casa Duse. It is undisputed that Merkin's claimed copyright interest, whether communicated by Merkin or Reichman, resulted in the cancellation of the screening and the reception. *16 Casa Duse*, 2013 WL 5510770 at *13 n.5, 2013 U.S. Dist. LEXIS 143958 at *40-41 n.5. Thus the second and fourth requirements for a cause of action were met. Merkin argues, however, that Casa Duse has failed to establish the first and third elements of the claim.

As to the first, Merkin argues that Casa Duse has failed to demonstrate the "business relations" component of its claim because "a one night rental is not a business relationship." Appellant's Br. at 36. Merkin cites no authority for this proposition. New York courts have placed some limits on what constitutes "business relations" by rejecting, for example, a claim containing "only a general

allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship," *McGill v. Parker*, 179 A.D.2d 98, 105, 582 N.Y.S.2d 91, 95 (1st Dep't 1992), but Casa Duse has raised more than such a general allegation by pointing to its business relationships with the NYFA and the restaurant.

As to the third element, Merkin argues that Casa Duse has failed to show that he "acted for a wrongful purpose or used dishonest, unfair, or improper means." *Catskill Dev.*, 547 F.3d at 132. We agree. Merkin correctly notes that the "wrongful means" element sets a high bar. Unlike a claim for tortious interference with contract, which requires a plaintiff to show no more than that the defendant intentionally and without justification procured a breach of a valid contract of which he was aware, *see Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (1996), a claim for tortious interference with business relations requires a plaintiff to show, "as a general rule," that "the defendant's conduct . . . amount[ed] to a crime or an independent tort," *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 1103 (2004). New York courts have recognized an exception to this rule "where a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs.'" *Id.*

(quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 215 A.D.2d 990, 990, 628 N.Y.S.2d 408 (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614, 664 N.E.2d 492 (1996)).  But this exception is narrow:  When a defendant has acted with a permissible purpose, such as "normal economic self-interest," wrongful means have not been shown, even if the defendant was "indifferent to the [plaintiff's] fate." *Id.*  The New York Court of Appeals has not yet identified any other exceptions to the general rule. *See id.*, 3 N.Y.3d at 190-91, 818 N.E.2d at 1103-04.

Merkin's interaction with the NYFA director was not criminal, and Casa Duse does not argue that his conduct was independently tortious.  Nor does Casa Duse allege that Merkin acted for the sole purpose of harming the company.  Casa Duse instead urges us to find that Merkin's insistent assertion of his copyright interest in the film constituted wrongful means, because he demonstrated a "willful[] blind[ness] to the factual and legal realities of [his] position." *16 Casa Duse*, 2013 WL 5510770 at *13, 2013 U.S. Dist. LEXIS 143958 at *42.

New York courts have left open the possibility that a defendant who has "harass[ed]" a plaintiff with "meritless litigation" may have utilized "wrongful means." *See Carvel Corp.*, 3 N.Y.3d at 192, 818 N.E.2d at 1104.  But although we

have concluded that Merkin's copyright claims ultimately must fail, we must also conclude, in light of the conclusion of at least one appellate panel, *see Garcia*, 766 F.3d 929, that they were not frivolous, objectively unreasonable, or patently meritless. *Garcia* is not on all fours with the case before us, but it is close enough for that purpose. There is also no indication in the record that Merkin utterly lacked belief in the merit of his copyright claim or that he intended only to harass Casa Duse. We conclude that his insistence, however misguided, on his copyright interest did not amount to "the sort of egregious wrongdoing that might support a tortious interference claim in the absence of [] an independently unlawful act or evil motive." *Carvel Corp.*, 3 N.Y.3d at 189, 818 N.E.2d at 1102-03.

V.     Fees and Sanctions

Merkin and Reichman argue that the district court made legal errors in awarding fees and costs to Casa Duse under the Copyright Act, 17 U.S.C. § 505, and imposing sanctions against Reichman in the form of fees and costs under 28 U.S.C. § 1927. We disagree.

The district court did not err in granting Casa Duse's motion for attorney's fees even though the motion was filed prior to the entry of judgment. A motion for attorney's fees must "be filed *no later than* 14 days after the entry of

judgment." Fed. R. Civ. P. 54(d)(2)(B)(i) (emphasis added). "'Prompt filing . . . enables the court in appropriate circumstances to make its ruling on a fee request in time for any appellate review of a dispute over fees to proceed at the same time as review on the merits of the case.'" *Weyant v. Okst*, 198 F.3d 311, 314 (2d Cir. 1999) (ellipsis in original) (quoting Fed. R. Civ. P. 54 Advisory Committee Note (1993)). But although the 14-day filing limit runs from the entry of a final judgment, *see id.*, Merkin and Reichman have not explained why the district court could not grant a motion that was filed prior to a final judgment.

Nor did the court err in concluding that the Copyright Act allows a party that has not registered a copyright to recover costs and fees under specified circumstances. Under the Act, a court may, in its discretion, "allow the recovery of full costs by or against any party other than the United States or an officer thereof" in "any civil action under [the Copyright Act]" and "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Another section of the Act, entitled "Registration as prerequisite to certain remedies for infringement," limits recovery in infringement actions, barring recovery for infringement that occurred prior to registration:

> In any action under this title, [with exceptions not relevant here], no award of statutory damages or of attorney's fees, as provided by . . .

[section] 505, shall be made for (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412. Merkin argues that this section of the law prohibits Casa Duse, which did not register a copyright in the film, from collecting fees and costs. But Casa Duse has not brought an "infringement action." It seeks instead a declaratory judgment that it has *not* infringed on Merkin's putative copyright. "[T]here is nothing in the statute that prohibits fee awards in cases, like this one, of *non* infringement." *Latin Am. Music Co. v. Am. Soc'y Of Composers, Authors & Publishers (ASCAP)*, 642 F.3d 87, 90 (1st Cir. 2011) (emphasis in original) (concluding that a defendant in an infringement action may obtain fees and costs under section 505 despite not having registered a copyright).

Reichman also argues that the district court erred by finding him jointly and severally liable with Merkin for costs and fees, because the Copyright Act allows for the imposition of costs and fees only against a "party," not against a party's attorney. 17 U.S.C. § 505. But the court awarded costs and fees to Casa Duse under both the Copyright Act and 28 U.S.C. § 1927. The latter statute allows a court to require an attorney to "satisfy personally" costs and fees. 28

U.S.C. § 1927. The district court's allocation of costs and fees was not contrary to law.

Merkin and Reichman finally argue that even if fees and costs were available under these statutes, the district court abused its discretion in awarding them to Casa Duse under 17 U.S.C. § 505 and 28 U.S.C. § 1927. As to the former, a district court determining whether to exercise its discretion to award fees under the Copyright Act "may consider such factors as (1) the frivolousness of the non-prevailing party's claims or defenses; (2) the party's motivation; (3) whether the claims or defenses were objectively unreasonable; and (4) compensation and deterrence." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010). As to the latter, "[s]anctions may be imposed . . . only when there is a finding of conduct constituting or akin to bad faith . . . . [A]n award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 115 (internal quotation marks omitted).

Merkin and Reichman argue that their copyright theory was not "objectively unreasonable," *see Bryant*, 603 F.3d at 144 (noting that this factor

should be accorded "substantial weight"), let alone "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay," *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 115 (internal quotation marks omitted), because it was based on their reading of the Copyright Office's website. We have concluded, in the context of Casa Duse's tortious interference with business relations claim, that the appellants were not evidently motivated solely by the desire to harm Casa Duse. We have also concluded that the defendants' copyright claims are without merit. Given our remand to the district court, which may reconsider its grant of costs and fees and its imposition of sanctions in light of our reversal of the tortious interference judgment, we need not determine whether Merkin's and Reichman's reliance on the Copyright Office website was objectively unreasonable, nor whether other factors weigh in favor of granting fees to Casa Duse under the Copyright Act, nor whether Reichman's conduct was "akin to bad faith" sufficient to sustain the sanctions entered against him. *Id.* The district court may consider these contentions on remand if and when it is required to calculate costs and fees with respect to the copyright claims only, without reference to the tortious interference claim, which we conclude is without merit.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to Casa Duse on its copyright claims and thus the court's entry of a permanent injunction against Merkin, REVERSE the district court's grant of summary judgment to Casa Duse on its tortious interference with business relations claim, and REMAND to the district court with instructions to enter summary judgment in favor of Merkin on that claim, based thereon to reexamine its award of costs and attorney's fees, and for such other proceedings as are warranted.